2024 IL App (2d) 230305-U
No. 2-23-0305
Order filed September 11, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-2125 |
| JIMMY M. MARTINEZ, | ) ) | Honorable David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE KENNEDY delivered the judgment of the court.
Justices Hutchinson and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's second-amendment challenge to the statute criminalizing a felon's possession of a firearm fails because (1) the amendment's protection is reserved for law-abiding citizens and (2) even if felons fall within the letter of the second amendment, the challenged statute is valid because it is consistent with our Nation's history of firearms regulation, in which there is precedent for disarming groups deemed potentially dangerous.

¶ 2    Defendant, Jimmy Martinez, appeals from his convictions of unlawful use or possession of a weapon by a felon (UUPWF) (720 ILCS 5/24-1.1 (West 2018)). He contends that, under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the UUPWF statute on its face

violates the second amendment to the United States Constitution (U.S. Const., amend II) and, thus, his convictions must be reversed. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On January 9, 2019, defendant was indicted on four felony charges, stemming from an October 26, 2018, search of his Elgin home pursuant to a search warrant. Count I alleged that defendant unlawfully possessed with the intent to deliver 15 grams or more but less than 100 grams of a substance containing cocaine (720 ILCS 570/401(a)(2)(A) (West 2018)). Count II alleged that defendant unlawfully possessed 15 grams or more but less than 100 grams of a substance containing cocaine (*id.* § 402(a)(2)(A)). Count III charged UUPWF and alleged that defendant knowingly possessed a firearm, "a Ruger 9mm pistol," after having been previously convicted of a felony, aggravated unlawful use of a weapon (in Cook County case No. 2011-C-3301060). Count IV also charged UUPWF (*id.*) and alleged that defendant knowingly possessed a firearm, "a Ruger 9mm pistol," after having been previously convicted of a felony, unlawful possession of a controlled substance (in McHenry County case No. 13-CF-20).

¶ 5      On December 18, 2020, defendant filed a "Motion to Quash Search Warrant and Suppress Evidence Illegally Seized," arguing that the search warrant lacked probable cause. The State filed a response on April 1, 2021. On February 10, 2022, the trial court denied the motion. Defendant's subsequent motion for reconsideration was denied on May 20, 2022.

¶ 6      On June 1, 2023, the matter proceeded to a stipulated bench trial. The evidence consisted of two documents, each titled "Joint Stipulation of the Parties," and various items admitted as People's exhibits Nos. 1 through 29.[1]

_____

[1]There was no People's exhibit No. 4. The two stipulations were admitted as People's

¶ 7    The stipulated evidence generally established the following. On October 26, 2018, officers from the Illinois State Police Swat Team and the North Central Narcotics Task Force (Task Force) executed a search warrant for defendant's person and an Elgin apartment. Defendant was found in the apartment, given a copy of the search warrant, and read his *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) by Task Force Master Sergeant Backus. During the search, the officers recovered (1) a clear plastic bag containing 32.2 grams of cocaine (People's exhibit No. 1), (2) four clear, knotted plastic bags weighing a combined 2.41 grams and containing suspected (untested) cocaine (People's exhibit No. 2), (3) a clear plastic bag weighing 2.31 grams and containing suspected (untested) cocaine (People's exhibit No. 3); (4) a Ruger 9-millimeter pistol (People's exhibit No. 5), (5) a loaded magazine found inside the Ruger 9-millimeter pistol (People's exhibit No. 6), (6) a black Apple iPhone (People's exhibit No. 7), (7) a digital scale with white powder residue (People's exhibit No. 8), (8) an LG flip phone (People's exhibit No. 9), (9) 9-millimeter ammunition (People's exhibit No. 10), (10) vehicle documentation belonging to defendant (People's exhibit No. 11), and (11) an insurance letter addressed to defendant (People's exhibit No. 12). People's exhibit Nos. 13-28 were photographs taken at the scene, showing, among other things, the foregoing items before collection. Also pictured was $1315 in U.S. currency recovered from a bedroom dresser.

¶ 8    Edward McGill, a forensic scientist at the Illinois State Police Rockford Crime Laboratory, would testify that, although People's exhibit Nos. 2 and 3 were not tested for the presence of a controlled substance, the contents of each exhibit were consistent in physical appearance with People's exhibit No. 1 and, in his opinion, contained cocaine.

---

exhibit Nos. 30 and 31.

¶ 9    Backus would testify that, while escorting defendant to a squad car, defendant stated that he lived alone at the apartment. Task Force Inspector Neamand would testify that, while transporting defendant to the police department, defendant told Neamand that he lived alone in the apartment but that his mother was the leaseholder. Later, Neamand and Task Force Inspector Young interviewed defendant. Neamand and Young would testify that defendant admitted to possessing the cocaine and the Ruger pistol but denied "sell[ing] drugs."

¶ 10   Young, an expert "in the field of cannabis, cocaine, and drug trafficking," would testify that, in his opinion, defendant possessed the cocaine with the intent to deliver it. Young's opinion was based on (1) the amount of the cocaine, (2) the nature of the packaging, (3) the digital scale, (4) the two cellular phones, (5) the $1315 in U.S. currency, (6) the loaded firearm, and (7) the absence of "cocaine user paraphernalia."

¶ 11   The stipulations further provided that, on October 26, 2018, (1) defendant had a previous felony conviction of aggravated unlawful use of a weapon (in Cook County case No. 2011-C-3301060); (2) defendant had a previous felony conviction of unlawful possession of a controlled substance (in McHenry County case No. 13-CF-20); (3) defendant did not possess, and was not eligible to obtain, a valid Firearm Owners Identification (FOID) card; and (4) the firearm recovered was a "firearm" as defined by section 1.1 of the Firearm Owners Identification Card Act (FOID Card Act) (430 ILCS 65/1.1 (West 2016)).

¶ 12   After the State rested, defendant indicated that he did not wish to present evidence but that the stipulations should not be considered a waiver of his argument that the search warrant lacked probable cause.

¶ 13   The trial court found defendant guilty of all counts and set the matter for sentencing.

¶ 14    On September 11, 2023, defendant filed a motion for a new trial. Defendant argued that the trial court erred in denying defendant's motion to quash the search warrant and his subsequent motion to reconsider.

¶ 15    On September 13, 2023, the trial court denied defendant's motion for a new trial. Following a sentencing hearing, the court merged count II into I and count IV into count III. It sentenced defendant to seven years each on counts I and III, to run concurrently.

¶ 16    This timely appeal followed.

¶ 17                                    II. ANALYSIS

¶ 18    Defendant contends that, under the analysis recently established by the Supreme Court in *Bruen,* the UUPWF statute is facially unconstitutional because it violates a felon's second amendment right to keep and bear arms. The State responds that the UUPWF statute is not unconstitutional under *Bruen,* because the plain text of the second amendment does not apply to convicted felons and, even if it did, historical analysis supports a tradition that allows for statutes dispossessing felons of firearms. We agree with the State.

¶ 19    In considering the issue, we keep the following well-established principles in mind. "A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity." *People v. Graves*, 207 Ill. 2d 478, 504 (2003). "A party raising a facial challenge to a statute faces a particularly heavy burden." *People v. Bochenek*, 2021 IL 125889, ¶ 10. "A statute will be deemed facially unconstitutional only if there is no set of circumstances under which the statute would be valid." *Id.* "We have a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can reasonably be done." *People v. Hollins*, 2012 IL 112754, ¶ 13. The constitutionality of a statute is a question of law, which we review *de novo*. *People v. Garvin*, 219 Ill. 2d 104, 116 (2006).

¶ 20    The UUPWF statute (720 ILCS 5/24-1.1(a) (West 2018)) provides in relevant part:

"(a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction. This Section shall not apply if the person has been granted relief by the Director of the Department of State Police under Section 10 of the [FOID Card Act].[Footnote omitted.]"

The second amendment provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend II.

¶ 21    We begin with a review of the relevant Supreme Court decisions. In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court declared for the first time that the second amendment right to keep and bear arms is an *individual* right rather than a *collective* right. In *Heller*, the Court struck down a series of District of Columbia laws that banned handgun possession in the home and required other types of firearms to be kept unloaded and disassembled or bound by a trigger lock or similar device. *Id.* at 575, 635. The Court held that the laws violated the second amendment's protection of "the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." (Emphasis added.) *Id.* The Court noted, however, that "the right secured by the Second Amendment is not unlimited." *Id.* at 626. The Court admonished that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill[.]" *Id.*

¶ 22    Two years later, in *McDonald v. City of Chicago*, 561 U.S. 742, 789-91 (2010), the Court held that the second amendment's "right to keep and bear arms for the purpose of self-defense"

applied to the States through the fourteenth amendment (U.S. Const. amend. XIV). Further, it struck down laws enacted by the City of Chicago and a Chicago suburb similar to those in *Heller*. *Id.* at 750. In so holding, the Court stated: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill[] \*\*\*.' [Citation.] We repeat those assurances here." *Id.* at 786.

¶ 23    In 2022, the Supreme Court decided *Bruen*. The issue in *Bruen* was whether "*ordinary, law-abiding citizens* have a \*\*\* right to carry handguns publicly for their self-defense." (Emphasis added.) *Bruen*, 597 U.S. at 9. The Court held that, "consistent with *Heller* and *McDonald*, \*\*\* the Second and Fourteenth Amendments" protect such a right. *Id.* at 10. Thus, it struck down New York's licensing laws that conditioned the issuance of public-carry licenses on a showing of a special need. *Id.* at 11.

¶ 24    In deciding the issue, the *Bruen* Court recognized that, following *Heller*, "the Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-ends scrutiny." *Id.* at 17. At the first step, the government could justify the firearm restriction by demonstrating that the impacted activity fell outside the scope of the second amendment as originally understood. *Id.* at 18. If the government proved that the regulated activity fell beyond the amendment's original scope, the court would uphold the regulation without further analysis. *Id.* If, however, it was unclear that the activity was unprotected, the court would proceed to the second step, in which the court would weigh the severity of the firearm regulation—the means—against the ends the government sought to achieve. *Id.* The level of scrutiny would depend on how close the regulation came to the core of the second amendment. *Id.*

¶ 25    The *Bruen* Court "decline[d] to adopt" this framework, noting that "*Heller* and *McDonald* do not support applying a means-end scrutiny in the Second Amendment context." *Id.* at 19. Instead, the *Bruen* Court set forth the following test for assessing the validity of statutes under the second amendment:

> "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)).

Thus, under *Bruen*, the court must first ask whether the second amendment's "plain text" covers an individual's conduct. *Id.* If it does, the question becomes whether the challenged statute is "consistent with this Nation's historical tradition of firearm regulation." *Id.*

¶ 26    After briefing in this case was complete, the Court decided *United States v. Rahimi*, No. 22-915, 2024 WL 3074728, *6 (U.S. June 21, 2024), which reaffirmed the *Bruen* test and emphasized that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." *Id.* *10. "In fact," the Court noted, "*Heller* stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " *Id.* (quoting *Heller*, 554 U.S. at 626, 627 n.26). The Court in *Rahimi* rejected a facial challenge to a federal statute (18 U.S.C. § 922(g)(8)) that prohibited firearm possession by a person subject to a domestic-violence restraining order that protected an intimate

partner or the partner's child. *Id.* *4, 5. The Court held that the statute was not facially invalid given that one of the bases for prohibiting firearm possession by the subject of the order was that he or she presented a credible threat to the physical safety of the intimate partner or the partner's child. *Id.* *7 (citing 18 U.S.C § 922(g)(8)(C)(i)). For reasons not apparent, the Court did not apply the first part of the *Bruen* test but considered only whether the statute was consistent with the Nation's history of firearms regulation. *Id.* *10. After reviewing historical analogs of the statute, the Court found that "[o]ur tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* The Court concluded: "An individual found by a court to pose a credible threat to the physical safety of another may be temporarily disarmed consistent with the Second Amendment." *Id.* *11.

¶ 27 Defendant's challenge to the UUPWF statute fails at the first step of the *Bruen* analysis because, contrary to defendant's assertion, felons are not included in "the people" to whom the second amendment refers.

¶ 28 We find instructive *People v. Baker*, 2023 IL App (1st) 220328, *pet. for leave to appeal pending*, No. 130174 (filed Nov. 3, 2023). In *Baker*, the defendant argued that the UUPWF statute, as applied to him, was unconstitutional under the framework announced in *Bruen*. *Id.* ¶¶ 33, 37. The First District concluded that defendant could not mount a second-amendment challenge to the statute because "*Bruen* just [did] not apply to him," given his status as a felon. *Id.* ¶ 37. The court explained:

> "The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant. *Bruen*, 597 U.S. at [71], 142 S. Ct. at 2156 (the holding was limited to laws affecting 'law-abiding citizens'). Just in case a reader missed the first time

that the court said it, the court repeated it 18 times. *Bruen*, 597 U.S. [1], 142 S. Ct. 2111 *passim* (the six justices in the majority repeated the phrase 'law-abiding' 18 times in their majority opinion and their concurrences). Further, Justice Kavanaugh in his concurrence quoted an earlier case that stated: ' "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons ***." ' *Bruen*, 597 U.S. at [81], 142 S. Ct. at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27, 128 S. Ct. 2783). Justice Kavanaugh's concurrence was joined by Chief Justice Roberts, and they both joined the six-justice majority opinion. Based on the plain, clear, and repeated language of the justices in the majority, defendant is simply outside the box drawn by *Bruen*." *Baker*, 2023 IL App (1st) 220328, ¶ 37.

¶ 29   As the State notes, we have recently issued two unpublished decisions that similarly rejected *Bruen*-based challenges to the UUPWF statute by agreeing with *Baker* and holding that felons are not a part of "the people" in the plain text of the amendment.[2] See *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 153, *pet. for leave to appeal pending,* No. 130680 (filed May 8, 2024) ("As defendant does not dispute that he is a convicted felon for purposes of the [UUPWF] statute, he is not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' referenced in the second amendment."); *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 24, *pet. for leave to appeal pending*, No. 130714 (filed May 23, 2024) ("We *** hold that 'the people' referenced in the second amendment are law-abiding citizens."). In addition, in *People v. Smith*, 2023 IL App (2d) 220340-U, ¶ 57, *pet. for leave to appeal pending*, No. 130343

---

[2]Orders issued under Illinois Supreme Court Rule 23(b) (eff. Feb. 1, 2023) on or after January 1, 2021, "may be cited for persuasive purposes." Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023).

(filed Jan. 24, 2024), we similarly rejected a second amendment challenge under *Bruen* to the armed habitual criminal (AHC) statute (720 ILCS 5/24-1.7 (West 2020)): "[A]s defendant concedes that he is a repeat convicted felon for purposes of the [AHC] statute, he is not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' reference in the second amendment."

¶ 30    We agree with *Baker* and our previous decisions. As we noted in *Echols*:

"[T]he clear implication of *Bruen* is that 'the people' referenced in the second amendment are 'law-abiding' citizens. See, *e.g.*, *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ('Congress did not violate [the defendant's rights] by enacting § 922(g)(1) [(18 U.S.C. § 922(g)(1) (2020) (the federal unlawful-possession-of-a-weapon-by-a-felon statute)]. He is not a law-abiding citizen, and history supports the authority of Congress to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society.'); *United States v. Garrett*, 650 F. Supp. 3d 638, 640 (N.D. Ill. 2023) ('Courts in this jurisdiction and elsewhere have relied on the focus in [*Bruen*, *McDonald*, and *Heller*] on the rights of "law-abiding" citizens to hold that the government may, consistently with *Bruen*[,] disqualify convicted felons from exercising the rights the Second Amendment guarantees.'); *United States v. Coleman*, 2023 WL 122401, at *2 (N.D. W. Va. 2023) ('The Supreme Court notes throughout its decisions that the challenging parties are "law-abiding" citizens. The implication is clear: the reach of *Bruen* ends at the feet of those individuals who are not law-abiding citizens.'); *United States v. Medrano*, 2023 WL 122650, at *2 (N.D. W. Va. 2023) ('The bottom line is [the defendant's] status as a felon removes him from "the people" enumerated in the Second Amendment.'); *United States v. Seiwert*, 2022 WL 4534605, *1 (N.D. Ill. 2022) (quoting

*Heller*, 554 U.S. at 635) (noting that the right secured by the second amendment 'extends only to "the people," which encompasses only "law-abiding, responsible" citizens who keep or bear arms for "lawful purposes." '); *United States v. Ingram*, 623 F. Supp. 3d 660, 664 (D. S.C. 2022) ('By distinguishing non-law-abiding citizens from law-abiding ones, the [*dicta*] in *Heller* and *McDonald* clarifies the bounds of the plain text of the Second Amendment. This, coupled with the majority's focus in *Bruen* on the Second Amendment rights of "law-abiding citizens" throughout the opinion convinces this Court that the Supreme Court would conclude that these statutes fail to infringe on any Second Amendment rights.')." *Echols*, 2024 IL App (2d) 220281-U, ¶ 153.

¶ 31 Further, we note that several published Illinois decisions have similarly concluded that the second amendment protects the rights of only law-abiding citizens. See *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 22 (rejecting the defendant's facial challenge to the AHC statute, stating that "*Bruen* is clear that second amendment rights apply to law-abiding citizens for self-defense"); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21 (rejecting the defendant's constitutional challenge to the UUPWF statute, holding that "*Bruen* simply does not apply to [the] defendant. The second and fourteenth amendments protect the right of 'law-abiding citizens' to possess handguns"); *People v. Hatcher*, 2024 IL App (1st) 220455, ¶¶ 56, 59, *pet. for leave to appeal pending,* No. 130078 (filed May 22, 2024) (rejecting the defendant's facial challenge to the aggravated unlawful use of a weapon statute (720 ILCS 5/24-1.6(a)(1)(3)(A-5)(C), (I) (West 2018)), which criminalizes possession of a weapon under certain circumstances without a valid license under the Firearm Concealed Carry Act (430 ILCS 66/1 *et seq.* (West 2018)) or a valid FOID card, noting that "*Bruen* expressly and repeatedly limits the second amendment's scope to law-abiding citizens"); *People v. Mobley*, 2023 IL App (1st) 221264, ¶¶ 28, 29, *pet. for leave to*

*appeal pending*, No. 130417 (filed Jan. 31, 2024) (where the record showed that the defendant had "at least 14 felony convictions, including convictions for violent crimes," the defendant could not challenge under *Bruen* the UUPWF statute as applied to him because "*Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms").

¶ 32     Numerous unpublished Illinois decisions have read the second amendment's text similarly. See *People v. Box*, 2024 IL App (4th) 230649-U, ¶ 81, *pet. for leave to appeal pending*, No. 130803 (filed June 21, 2024) (rejecting the defendant's constitutional challenge to the UUPWF statute, holding that "*Bruen* does not apply to [the] defendant, as the second and fourteenth amendments protect the right of 'law-abiding citizens' to possess handguns"); *People v. Leonard*, 2024 IL App (4th) 230413-U, ¶ 15, *pet. for leave to appeal pending*, No. 130678 (filed May 8, 2024) (rejecting the defendant's facial and as-applied challenges to the AHC statute because the "defendant's previous felony convictions make him *not* a law-abiding citizen and, therefore, *not* protected by the second amendment" (emphases in original)); *People v. Langston*, 2023 IL App (4th) 230162-U, ¶ 19, *pet. for leave to appeal pending*, No. 130369 (filed Jan. 16, 2024) (rejecting the defendant's facial constitutional challenge to the UUPWF statute, finding "nothing in [the] defendant's arguments to persuade [the court] to believe *Bruen* does not apply to felons *simpliciter*[.]"); *People v. Muhammad*, 2023 IL App (1st) 230121-U, ¶¶ 17-24, *pet. for leave to appeal pending*, No. 130385 (filed Jan. 22, 2024) (relying on *Baker* and rejecting the defendant's facial and as-applied challenges to the UUPWF statute, holding that his status as a felon removed him from the first step of the *Bruen* analysis); *People v. Robinson*, 2023 IL App (1st) 220959-U, ¶ 40, *pet. for leave to appeal pending*, No. 130398 (filed Jan. 24, 2024) ("In *Heller*, *McDonald*, and *Bruen*, the Supreme Court made clear that felons are not, and have historically not been, categorically protected by the second amendment as 'law-abiding citizens.' "); *People v. Boyce*,

2023 IL App (4th) 221113-U, ¶ 16, *pet. for leave to appeal pending*, No. 130220 (filed Nov. 20, 2023) (rejecting the defendant's constitutional challenge to the UUPWF statute because "the *Bruen* decision does not apply to felons").

¶ 33    We recognize that one panel of the First District, in considering the constitutionality of the UUPWF statute, has held that felon status is "irrelevant" at the first stage of the *Bruen* analysis and, thus, even a felon's possession of a firearm is " 'presumptively constitutional.' [Citation.]." See *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 89, *pet. for leave to appeal pending*, No. 130153 (filed Oct. 30, 2023). One panel of the Third District adopted *Brooks*' reasoning when considering facial and as-applied constitutional challenges to the AHC statute and the UUPWF statute. See *People v. Travis*, 2024 IL App (3d) 230113, ¶ 26, *pet. for leave to appeal pending*, No. 130696 (filed May 16, 2024).

¶ 34    We decline to follow *Brooks*' reasoning as to the first step of the *Bruen* analysis.[3] Instead, we join the great weight of authority in Illinois and agree that the second amendment does not apply to a felon's firearm possession.

¶ 35    Even if we presumed that a felon's firearm possession is covered under the plain text of the second amendment, defendant's challenge to the UUPWF statute would fail under *Bruen*'s

---

[3]We note that both *Brooks* and *Travis* upheld the challenged statutes under the second stage of the *Bruen* analysis. See *Brooks*, 2023 IL App (1st) 200435, ¶ 105 ("[W]e conclude that the legislature's ability to impose status-based restrictions disqualifying certain categories of people from possessing firearms is consistent with the national historical tradition of firearm regulation."); *Travis*, 2024 IL App (3rd) 230113, ¶ 33 ("[W]e conclude there is a history and tradition dating back to the founding era of identifying dangerous individuals and disarming them.")

second step, which asks whether the state can demonstrate that the UUPWF statute "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. Defendant contends that there is no historical tradition of firearms regulation that supports a "flat ban" on firearm possession by convicted felons. We disagree.

¶ 36 Despite our disagreement with *Brooks*' conclusion that felons are covered under the plain text of the second amendment, we nevertheless find particularly instructive *Brooks*' analysis on the issue of whether the UUPWF statute is consistent with the Nation's historical tradition of firearm regulation.

¶ 37 In *Brooks*, the court considered an as-applied challenge to the AHC statute. *Brooks*, 2023 IL App (1st) 200435, ¶ 1. The *Brooks* court summarized as follows the State's burden under *Bruen*'s second step:

> "To carry this burden, the government must point to 'historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation.' [Citation.] Noting that 'when it comes to interpreting the Constitution, not all history is created equal,' the Court made clear that the relevant inquiry centers on what the founders understood the second amendment to mean. [Citation.] In other words, the Court clarified that in looking to historical context, the most relevant time period is that of the amendment's enactment (in 1791). [Citation.] [Footnote omitted.]
>
> In directing courts to canvass historical periods for context, the Court acknowledged that the task would not always be 'straightforward,' particularly when it involved 'unprecedented societal concerns or dramatic technological changes.' [Citation.] Noting that in such circumstances 'a more nuanced approach' was necessary, the Court instructed lower courts to seek out similar regulations and to reason by analogy. [Citation.]

As the Court explained, it is not necessary to identify a 'historical twin'; rather a 'well-established and representative [historical] *analogue* will do.' (Emphasis in original.) [Citation.]

The Court further clarified that 'analogical reasoning' under the second amendment should not be 'a regulatory straitjacket nor a regulatory blank check.' [Citation.] As such, 'courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risk[s] endorsing outliers that our ancestors would never have accepted." ' [Citation.] However, 'even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.' [Citation.] The core question is whether the challenged regulation and the proffered analogue are 'relevantly similar.' [Citation.]

The Court then clarified two metrics to be used in comparing the government's proffered analogues against the challenged law, namely: (1) how the challenged law burdens the right to bear arms; and (2) why the law burdens that right. [Citation.] In short, the Court explained that the proper inquiry turns on whether the 'modern and historical regulations imposes a comparable burden on the right of armed self-defense, and *** whether that burden is comparably justified.' [Citation.]" *Id.* ¶¶ 70-73.

¶ 38 The *Brooks* court engaged in an extensive historical analysis dating back to 17th century England and ultimately concluded that "there is a historical tradition of legislatures exercising their discretion to impose status-based restrictions disarming entire categories of persons who, based on their past conduct, were presumed unwilling to obey the law." (Internal quotations omitted.) *Id.* ¶ 97. "While the particular groups varied over time, the founders understood that felons were one such group." *Id.*

¶ 39    The court began by noting that, in 17th Century England, the government "repeatedly disarmed individuals whose conduct reflected that they could not be trusted to abide by the sovereign and [his] dictates." (Internal quotations omitted.) *Id.* ¶ 93. Those disarmed included, first, "non-Anglican Protestants who refused to participate in the Church of England and those who were dangerous to the Peace of the Kingdom" and, later, "Catholics who refused to renounce their faith." (Internal quotations omitted.) *Id.* The court noted that, later, "[i]n colonial America, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law." *Id.* ¶ 94. "As such, Native Americans, and other minority groups, like Catholics in Maryland and Pennsylvania were banned from owning firearms." *Id.* The court next noted that, "during the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to swear loyalty oaths." *Id.*

¶ 40    The *Brooks* court further noted that "[f]ounding-era criminal punishments also demonstrate the widespread acceptance of the legislature's authority to disarm felons." *Id.* ¶ 96. For instance, even for some nonviolent crimes such as deceit, forgery, and wrongful taking of property, the punishment included death or forfeiture of a person's entire estate (which the *Brooks* court presumed included firearms). *Id.* "Even some non-capital offenses triggered the permanent loss of an offender's estate, including any firearms." *Id.* An example was a 1786 New York statute that punished individuals who counterfeited state bills of credit with life imprisonment and the complete forfeiture of their estate (which, again, included firearms). *Id.* As one court has observed, "if someone was subject to death and forfeiture of their entire estate then such laws would have also foreclosed individuals from their right to keep and bear arms." *United States v. Ware*, 673 F. Supp. 3d 947, 959 (S.D. Ill. May 19, 2023). "As a matter of logic and experience, it makes sense

that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a 'comparable burden' as *Bruen* frames the standard *** to historical punishments for felonies." *United States v. Hurnes*, No. 1:22-CR-00057, 2024 WL 2701099 at *11 (N.D. Ill. May 24, 2024).

¶ 41 While *Brooks'* historical survey uncovered no law that specifically prohibited felons from owning firearms, *Brooks* did cite laws that were persuasive analogs to the UUPWF statute. As the federal district court reasoned in *United States v. Head*, No. 23 CR 00450-1, 2024 WL 2292236, *10 (N.D. Ill. May 21, 2024)[4], (quoting *People v. Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, at *8 (N.D. Ill. Oct. 3, 2023)) the English disarmament laws "are relevant analogues to the [federal] felon dispossession statute, because they disarmed groups 'based on their perceived potential disobedience to the law (or sovereign).' " In addition, the Colonial and Revolutionary-era laws are evidence that, " 'by the time of the Second Amendment's ratification in 1791, there already was a historical tradition of legislatures disarming persons based on the perception (sometimes odious perceptions) that certain groups could not be trusted to be abide [by] the law or sovereign.' " *Id.* *11 (quoting *Agee*, *9).

¶ 42 Here, the State relies specifically on the "surety statutes" of the mid-19th century as analogous to the UUPWF statute. The surety statutes "required certain individuals to post bond before carrying weapons in public." *Bruen*, 597 U.S. at 55. In *Ware*, 673 F. Supp. 3d at 959, the

---

[4]The decisions of federal district courts may be considered as persuasive authority. *Home Star Bank & Financial Services v. Emergency Care & Health Organization*, Ltd., 2012 IL App (1st) 112321, ¶ 37 n.3.

district court found that the surety statutes were analogous to the federal unlawful possession-of-a-firearm-by-a-felon statute (18 U.S.C. § 922(g)(1)), stating:

"[The] [surety] statutes presumed a right to 'carry [a firearm] that [could] be burdened only if another could make out a specific showing of "reasonable cause to fear an injury, or breach of the peace." ' *Id.* (quoting Mass. Rev. Stat., ch. 134 § 16 (1836)). *** [T]he Second Amendment also begins with a presumption that the individual has the right to carry. However, § 922(g)(1) burdens this right just as the surety statutes did nearly two hundred years ago. Over 65% of prisoners in the United States will be arrested again within three years of their release and over 80% within nine years of their release. [Citation.] Thus, felons clearly fall within a category of people who are not only reasonably believed to, but also probable to cause an injury or breach of the peace. Although surety statutes did not disarm citizens, the statutes did burden the right guaranteed by the Second Amendment in a similar fashion."

¶ 43    As noted, the Court in *Rahimi* also reviewed the history of firearms regulation in England and early America. See *Rahimi*, No. 22-0915, 2024 WL 3074728, *7-10. The Court observed that, "[f]rom the earliest days of the common law, firearms regulations have included provisions barring people from misusing weapons to harm or menace others." *Id.* *7. "By the 1700s and early 1800s, *** two distinct legal regimes had developed that specifically addressed firearms violence." *Id.* These were the surety statutes and the " 'going armed' " statutes. *Id.* *7-8. The latter "provided a mechanism for punishing those who had menaced others with firearms." *Id.* *8. These two sets of laws, the Court concluded, "confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* *9.

¶ 44    Thus, even though there is no "historical twin" for the UUPWF statute, "there is evidence that categorical bans are permissible and that individuals that have been deemed dangerous, non-law abiding, or even reasonably likely to breach the peace may have their right to keep and bear arms restricted." *Ware*, 673 F. Supp. 3d at 959.

¶ 45    Defendant contends, however, that "the historical record does not support Illinois' flat ban on the possession of firearms by a convicted felon," but his arguments are not persuasive. First, he argues that the history of gun regulation demonstrates that most restrictions were based on dangerousness, not criminal history or status. However, contrary to defendant's argument, the status-based restrictions were based not on individualized assessments of dangerousness, but "on a conclusion that the category as a whole presented an unacceptable risk of danger if armed." See *Jackson*, 69 F. 4th at 504. Indeed, "[n]ot all persons disarmed under historical precedents—not all Protestants or Catholics in England, not all Native Americans, not all Catholics in Maryland, not all early Americans who declined to swear an oath of loyalty—were violent or dangerous persons." *Id.*

¶ 46    Defendant also argues that the status-based restrictions were temporary or easily removable. For instance, he asserts that, in the case of Protestant monarchs prohibiting Catholics from possessing firearms unless they swore an oath of loyalty and renounced their papism, a person could remove the disability by appearing before a justice of the peace and swearing oaths of allegiance to the King. However, as the State notes, an individual prohibited from possessing a firearm under the UUPWF statute may analogously obtain relief under section 10(c) of the FOID Card Act (430 ILCS 65/10 (West 2020)) by submitting a petition showing

> "(1) the applicant has not been convicted of a forcible felony under the laws of this State or any other jurisdiction within 20 years of the applicant's application for a Firearm

Owner's Identification Card, or at least 20 years have passed since the end of any period of imprisonment imposed in relation to that conviction; (2) the circumstances regarding a criminal conviction, where applicable, the applicant's criminal history and his reputation are such that the applicant will not be likely to act in a manner dangerous to public safety; (3) granting relief would not be contrary to the public interest; and (4) granting relief would not be contrary to federal law."

See *Evans v. Cook County State's Attorney*, 2021 IL 125513, ¶ 35 ("The legislature clearly intended for felons to be able to obtain relief under section 10 of the FOID Card Act [(see 430 ILCS 65/10 (West 2020))]. Section 24-1.1(a)'s prohibition on the possession of weapons by felons says that it does not apply if the person has been granted relief under section 10 of the FOID Card Act. We do not believe that the legislature's intent was to create such a right and then make it impossible for anyone to obtain relief."). Although defendant argues that applying for reinstatement of the right to possess a firearm under this provision is akin to the "special need" provision struck down in *Bruen*, that case is distinguishable. There is a crucial difference between the government (1) applying its discretion to enable a law-abiding citizen to exercise the right to possess a firearm and (2) applying its discretion to reinstate a law-*breaking* citizen's right to possess a firearm.

¶ 47    Finally, defendant directs our attention to three "founding-era proposals" that were ultimately not incorporated into the second amendment. In one proposal, a majority of the New Hampshire convention suggested that the bill of rights limit the right to bear arms to those who had not engaged in " 'actual rebellion.' " See *Kanter v. Barr*, 919 F.3d 437, 454 (2019) (Barrett, J., dissenting) (quoting 1 Jonathan Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 326 (2d ed. 1891)). In the Massachusetts convention, Samuel

Adams proposed that only " 'peaceable citizens' " have the right to bear arms. *Id.* (quoting 2 Benard Schwartz, The Bill of Rights: A Documentary History 675, 681 (1971)). In the Pennsylvania convention, the influential Pennsylvania minority suggested that the citizens' right to bear arms not be infringed " 'unless for crimes committed, or real danger of public injury from [the] individuals.' " *Id.* at 456 (quoting 2 Schwartz, at 662, 665). Defendant cites then-Judge Barrett's comment, in dissent, that "[t]he concern common to all three [proposals] is not about felons in particular or even criminals in general; it is about threatened violence and the risk of public injury." *Id.* Thus, according to defendant, the proposals do not support the notion of a blanket disarmament of felons.

¶ 48    However, as defendant notes, none of the proposals were incorporated into the second amendment. It can be argued that this was because limitations on the rights of felons to keep and bear arms were understood. Recently, in *Head*, the court observed that the existence of the proposals supports "the proposition that it was ' " 'obvious' " ' to the Founders that persons who committed crimes would properly be subject to disarmament laws.' " *Head*, No. 23 CR 00450-1, 2024 WL 2292236, \*12  (quoting *Agee*, No. 1:21-CR-00350-1, 2023 WL 6443924, \* 9, citing Stephen P. Halbrook, The Founders' Second Amendment: Origins of the Right to Bear Arms 273 (2008) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood")). We agree with that reasoning.

¶ 49    In sum, defendant's challenge to the UUPWF statute fails under the *Bruen* analysis because felons, who are not law-abiding citizens, are not afforded the same second amendment protections enjoyed by "the people" referenced therein. Further, even if the text of the second amendment was

to be construed as presumptively protecting felons, the UUPWF statute is consistent with this Nation's historical tradition of firearms regulation.

¶ 50                                    III. CONCLUSION

¶ 51     For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 52     Affirmed.