2025 IL App (1st) 230678

No. 1-23-0678

Filed May 21, 2025

Third Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee. | ) ) | |
| v. | ) ) | No. 20 CR 10640 |
| FRANCISCO MACIAS, | ) ) | Honorable Alfredo Maldonado |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE MARTIN delivered the judgment of the court, with opinion.
Presiding Justice Lampkin and Justice D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1    Francisco Macias was charged with being an armed habitual criminal (AHC) after police found him possessing a handgun on a Chicago street in June 2020. Macias asserted the defense of necessity, claiming the civil unrest following the 2020 killing of George Floyd excused his firearm possession. The trial court refused to instruct the jury on the necessity defense, finding that the trial evidence did not support the instruction. The jury found Macias guilty of AHC, and he was sentenced to 13 years' imprisonment. On appeal, he argues the trial court erred in refusing to instruct the jury on necessity. Alternatively, Macias contends that, based on the United States

Supreme Court's decision in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the AHC statute violates both the federal and state constitutions. We affirm.[1]

¶ 2                                    I. BACKGROUND

¶ 3        Civil unrest occurred in Chicago in the wake of George Floyd's May 25, 2020, murder in Minneapolis, Minnesota. In response, the Chicago Police Department (CPD) deployed extra officers throughout the city. Officers Richard Hernandez and Tyler Fokas were assigned to monitor the intersection of West 26th Street and South Pulaski Road (26th and Pulaski), located in the neighborhood known as Little Village, on June 2, 2020.

¶ 4        After receiving a tip, the officers began walking toward Macias and ordered him to stop. Macias abruptly changed direction and began crossing the street while "grabbing his waistband." Macias quickened his pace as the officers pursued him. Moments later, each officer grabbed one of Macias's arms. Macias struggled but was eventually detained and placed in handcuffs. Officer Fokas then frisked Macias. Upon touching his waist, a firearm fell to the ground. Officer Hernandez immediately picked it up and discovered it to be a .9-millimeter Ruger semiautomatic, loaded with 11 rounds.

¶ 5        Macias was taken to a police station. After being advised of his *Miranda* rights (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), Macias explained that he received the firearm as a gift and admitted he kept it for protection. He did not mention civil unrest. The parties stipulated that Macias had two qualifying prior felony convictions.

¶ 6        Macias called four witnesses in his defense. Yadhia Garcia was working along with her parents at their produce stand near 26th and Pulaski on June 2, 2020. She felt unsafe. Around midday, Garcia witnessed a shooting. She had heard reports of break-ins, robberies, and other

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

shootings in Little Village in recent days. She had also observed stores set ablaze and rampant looting on Roosevelt Avenue (about 1.5 miles north of 26th Street). She felt the conditions near 26th and Pulaski, however, were better because "a lot of peacemakers" were on the streets, protecting local stores. Police officers were also present.

¶ 7        In the afternoon, Garcia noticed a group of men loitering nearby. They stared at her and the produce stand, making her uneasy. Macias, who was a family acquaintance, came along and greeted the Garcias. They alerted him to the strangers. Macias approached them, and after a brief conversation, the men walked away. Macias continued on his way. A short time later, Garcia observed Macias's arrest.

¶ 8        Osvaldo Silva managed a grocery store near 26th and Pulaski. On June 2, 2020, he was installing plywood over the windows to prevent looting while several local residents helped keep watch. Silva had hired two security guards as well. Silva saw Macias pass by the store around noon.

¶ 9        Guillermo Gutierrez worked for a violence prevention organization focused on Little Village. On June 2, 2020, Gutierrez was supervising a group of "street average [*sic*] workers"[2] who "work throughout Little Village mentoring young people who are involved in gangs, and they *** engage them in *** social activities and education." Large crowds of residents also gathered on the streets in Little Village to protect local businesses. Gutierrez did not mention any connection between these events and Macias, only identifying Macias in court as someone he has "seen around."

---

[2]We doubt Gutierrez said "average" and believe this was a transcription error.

¶ 10        Jorge Herrera owned a clothing store near 26th and Pulaski. He feared his business was threatened by the civil unrest occurring. Herrera hired 10 people to protect it, Macias not among them. Herrera saw Macias around noon on June 2, 2020.

¶ 11        During the jury instruction conference, Macias's counsel requested that the court instruct the jury on the defense of necessity. Counsel claimed the civil unrest occurring in Little Village created an imminent threat "that would require an individual to possess a weapon." The State objected. The court denied the request, explaining:

> "So I know *** the jury did hear plenty of evidence about the unrest, the civil unrest that was going on in the city and, specifically, in Little Village on June 2, 2020, but that unrest *** doesn't rise to the level of the necessity defense in particular to Mr. Macias. Mr. Macias is someone who is unable to possess a firearm because of his prior felony convictions.
>
> The case law that does talk about the applicability of necessity as to an armed habitual criminal is a situation where if there is a struggle and the defendant very briefly possesses a firearm in connection with some incidental struggle that was no fault of his own.
>
> In this instance we've heard evidence that the police were out in force in the neighborhood to try and restore order and to protect the community. To allow *** this instruction is to basically give credence to an instruction that somehow allows people who do not have the right to possess arms [license] to do so. That's not what the necessity instruction permits. I am cognizant of the fact that it just take[s] a mere scintilla of evidence, but this evidence that I have heard in this trial does not support necessity defense. Your request is respectfully denied."

¶ 12  In closing statements, Macias's counsel argued the State had failed to meet its burden to prove Macias possessed a firearm. Counsel's argument relied on the lack of both corroborating video evidence depicting the discovery of a firearm and any recording of Macias's alleged statements. The jury found Macias guilty of AHC.

¶ 13  In a motion for new trial, Macias argued the court erred by refusing to instruct the jury on necessity. The court rejected his argument, stating:

> "[T]he law of necessity is to avoid a greater evil. All Mr. Macias needed to do was just stay off the streets. This was not a situation where his home was being attacked or [in]vaded or anything like that. By choosing to go out in the streets he essentially acted like some sort of militia or vigilante, which is exactly what the laws prevent him from doing."

¶ 14  At sentencing, the State noted Macias had seven prior felony convictions for various drug and gun offenses, as well as a conviction for aggravated battery. The court sentenced Macias to a term of 13 years' imprisonment. This appeal followed.

¶ 15          II. ANALYSIS

¶ 16         A. Necessity Instruction

¶ 17  Macias first argues the court erred by refusing to instruct the jury on the defense of necessity. Criminal defendants are entitled to have the jury instructed on any defense theory, so long as there exists at least slight evidence in support of the theory. *People v. Brown*, 2017 IL App (3d) 140921, ¶ 22 (citing *People v. Davis*, 213 Ill. 2d 459, 478 (2004)). A trial court's determination that evidence was insufficient to justify the giving of an instruction is reviewed for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable

person would agree with it." (Internal quotation marks omitted.) *People v. Sloan*, 2024 IL 129676, ¶ 15.

¶ 18  Illinois law recognizes the affirmative defense of necessity:

"Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct." 720 ILCS 5/7-13 (West 2020); Illinois Pattern Jury Instructions, Criminal, No. 24-25.22 (approved Dec. 8, 2011).

¶ 19  To warrant instructing the jury on necessity, the defendant must show some evidence of each of the following elements: the defendant (1) " 'was without blame in occasioning or developing the situation' " and (2) " 'reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct.' " *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 65 (quoting 720 ILCS 5/7-13 (West 2018), and citing *People v. Janik*, 127 Ill. 2d 390, 399 (1989)). " 'This defense is viewed as involving the choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law.' " *Id.* (quoting *Janik*, 127 Ill. 2d at 399).

¶ 20  Proof of a "specific and immediate" threat of harm is a threshold requirement for the defense of necessity. *People v. Kite*, 153 Ill. 2d 40, 45 (1992). When the defendant presents no evidence supporting a specific and immediate threat of harm, the necessity instruction should be refused. *Id.*

¶ 21  At most, the evidence showed the threat of harm to people and businesses in Little Village was potential, but not imminent. Our precedent has consistently found that such threats are not so

specific and immediate to justify unlawful possession of a weapon. *Id.* at 47-48 (threats to kill an inmate made years before he was found possessing a knife did not qualify as a specific and immediate threat); *People v. Tackett*, 169 Ill. App. 3d 397, 402 (1988) ("Although the defendant had suffered from gang violence in the past, there was no evidence of any imminent danger."); *Taylor*, 2023 IL App (4th) 220381, ¶ 66 ("The mere possibility that [the shooting victim] could have had friends who may have wanted to retaliate is not evidence of a specific or immediate threat." (Emphases omitted.)); *People v. Boston*, 2016 IL App (1st) 133497, ¶ 44 (attacks from other inmates long before a defendant was discovered with a "shank" were too remote in time to be an immediate threat).

¶ 22        Moreover, there was no evidence of an impending injury to a specific person or business at the time and place Macias was found armed. The civil unrest occurring in Chicago was too general and remote to constitute a specific and immediate threat for Macias to reasonably believe it was necessary for him to possess a firearm. We find, therefore, that the trial court did not abuse its discretion in refusing a necessity defense instruction. We note that even if we had found error, we would find it harmless beyond a reasonable doubt, as the evidence disproving a necessity defense was overwhelming. See *People v. Hartfield*, 2022 IL 126729, ¶ 42 (harmless error analysis applies to errors in jury instructions).

¶ 23                            B. Constitutionality of AHC Statute

¶ 24        We turn to Macias's constitutional challenge to the AHC statute. Macias claims the statute violates both the second amendment to the United States Constitution (U.S. Const., amend. II) and article I, section 22 of the Illinois Constitution (Ill. Const. 1970, art. I, § 22). Although he failed to raise these issues before the trial court, a party may mount a facial constitutional challenge to a statute at any time. *People v. Villareal*, 2023 IL 127318, ¶ 13. A facial challenge asserts that a

statute is unconstitutional under any possible set of facts. *People v. Harris*, 2018 IL 121932, ¶ 38. Macias's challenge to the AHC statute is facial, as his arguments are not limited to his own specific facts and circumstances. See *id.* (explaining the distinction between facial and as-applied challenges).

¶ 25   A statute is facially unconstitutional only if there is no set of circumstances under which the statute would be valid. *People v. Eubanks*, 2019 IL 123525, ¶ 34. The challenging party faces a heavy burden: they must overcome our presumption of constitutionality and our duty to construe the statute in a manner upholding its validity if we reasonably can. *Villareal*, 2023 IL 127318, ¶ 14.

¶ 26   The AHC statute makes it a crime to receive, sell, possess, or transfer any firearm after having been convicted two or more times of any combination of either forcible felonies or other specified felony offenses. 720 ILCS 5/24-1.7(a) (West 2020).[3] Macias argues the AHC statute is invalid based on *Bruen*.

¶ 27   In *Bruen*, the Court established a two-step test to evaluate firearm regulations. First, courts must determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 24. If so, the conduct is presumptively protected, and the government "must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* To clear this hurdle, the government must point to "historical precedent from before, during, and even after the founding [that] evinces a comparable tradition of regulation." (Internal quotation marks omitted.) *Id.* at 27.

¶ 28   Since the Supreme Court rendered its decision in 2022, this court has considered numerous *Bruen*-based challenges to Illinois criminal statutes regulating firearm possession by felons. At least two panels of the First District found *Bruen* does not apply since felons are not " 'law-abiding

---

[3]The statute was subsequently amended to rename the offense "Unlawful possession of a firearm by a repeat felony offender." Pub. Act 103-822, § 20 (eff. Jan. 1, 2025).

citizens' " covered by the second amendment. *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37; *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 30. Other panels of the First District have followed the approach taken in *People v. Brooks*, 2023 IL App (1st) 200435. The *Brooks* court believed excluding felons from " 'the people' " protected by the second amendment incorrectly conflated *Bruen*'s two steps. *Id.* ¶¶ 88-89. That is, *Bruen*'s first step concerns only an individual's conduct. *Id.* ¶ 89. Whether felon status affects the right to possess a firearm is "more properly evaluated under the second step's historical tradition analysis." *Id.* We agree and believe the proper approach is to evaluate whether the challenged statute is consistent with the nation's historical tradition of firearm regulation.

¶ 29   The *Brooks* court concluded that the AHC statute is consistent with historical tradition. *Id.* ¶ 90. The opinion cited numerous legal and scholarly sources supporting a tradition of restricting felons from firearm possession. *Id.* ¶¶ 93-105. Such historical laws included, *inter alia*, the 1689 English Bill of Rights, colonial and founding era laws categorically disarming groups deemed untrustworthy or dangerous, unadopted proposals that would exclude felons from the right to bear arms, and founding era laws authorizing capital punishment and estate forfeiture for persons convicted of felonies. *Id.* Several decisions from this court have echoed *Brooks*. See, *e.g.*, *People v. Kelley*, 2024 IL App (1st) 230569, ¶ 20 ("the State has cited ample authority from around the country demonstrating a long-standing tradition of prohibiting felons from possessing firearms"); *People v. Travis*, 2024 IL App (3d) 230113, ¶ 33 ("we conclude there is a history and tradition dating back to the founding era of identifying dangerous individuals and disarming them"); *People v. Stephens*, 2024 IL App (5th) 220828, ¶ 39 ("We find the State has met its burden of showing that [the unlawful use of a weapon by a felon statute] is consistent with this nation's historical tradition of firearm regulation.").

¶ 30 Some federal district courts have likewise upheld statutes prohibiting felons from possessing firearms, based on the same historical precedent cited in *Brooks*. See, *e.g.*, *United States v. Coombes*, 629 F. Supp. 3d 1149 (N.D. Okla. 2022); *United States v. Rowson*, 652 F. Supp. 3d 436 (S.D.N.Y. 2023); *United States v. Rice*, 662 F. Supp. 3d 935 (N.D. Ind. 2023).

¶ 31 Macias urges us to depart from this substantial precedent. He argues the historical laws cited in those decisions fail to demonstrate that modern statutes are consistent with the nation's historical tradition. Yet, *Bruen* requires only that the government identify "a well-established and representative historical analogue." (Emphasis omitted.) *Bruen*, 597 U.S. at 30. *Brooks* and similar decisions found modern statutes consistent with multiple historical analogues. Applying *Bruen*, so long as we find one sufficiently analogous historical law, we can uphold the AHC statute. Accordingly, we need not address each of Macias's contentions or endeavor to conduct an exhaustive historical analysis anew.

¶ 32 We discuss two types of historical laws that courts have found analogous: (1) laws that authorized capital punishment and estate forfeiture for persons convicted of felonies and (2) laws that categorically prevented a group from possessing firearms based on a legislative judgment the group could not be trusted to adhere to the rule of law. Macias argues that neither type is "distinctly similar" to modern statutes that prevent felons from possessing firearms.

¶ 33 As to the first type, Macias asserts capital punishment or estate forfeiture affected an individual's ability to possess firearms, but not their right. He also points out that those penalties were part of a criminal sentence, unlike the AHC statute, which revokes an individual's right to possess firearms based on prior convictions, apart from the sentences imposed for those convictions. A federal district court rejected substantially similar arguments. We may look to federal decisions for guidance and adopt their reasoning if we find it persuasive. *Findlay v.*

*Chicago Title Insurance Co.*, 2022 IL App (1st) 210889, ¶ 63. In *Rice*, the court found this type of law sufficiently analogous, in part, since "estate loss inherently extinguishes the individual's possessory interest in any firearms they may have" and such arguments redefine the government's burden to require a " 'historical twin.' " 662 F. Supp. 3d at 948. We agree with both points. Macias's fine distinctions only show this type of law is not a historical twin or "dead ringer," which *Bruen* does not require. *Bruen*, 597 U.S. at 30 ("even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster").

¶ 34      As to the second type, Macias argues "laws banning firearm possession based on a person's membership in a disfavored group are an inappropriate basis to support [modern] laws *** [since] the laws were not rooted in *** the nation's historical tradition of treating disfavored groups as inferior and unworthy of the rights of a citizen." The point is well taken, but as the court in *Rowson* observed:

> "in our modern era, a law that would disarm a group based on race, nationality, or political point of view—or on the assumption that these characteristics bespoke heightened dangerousness—would be anathema, and clearly unconstitutional. [Citation.] But the Second Amendment's inquiry into historical analogues is not a normative one. Viewing these laws in combination, the above historical laws bespeak a 'public understanding of the [Second Amendment] right' in the period leading up to 1791 as permitting the denial of access to firearms to categories of persons based on their perceived dangerousness." *Rowson*, 652 F. Supp. 3d at 466.

To be sure, the reason such laws would be invalid today is the equal protection clause of the fourteenth amendment, not the second amendment. To reject these historical laws as analogues on this basis is moving the goalpost—shifting to an entirely different legal test from the one

established in *Bruen*. *Bruen* requires the State to point to a "relatively similar" regulation that imposes a comparable burden on the right of armed self-defense with comparable justification. *Bruen*, 597 U.S. at 29. Historical laws that categorically disarmed certain groups based on legislative judgment that the group was dangerous are repugnant. Nevertheless, they satisfy the standard.

¶ 35　　In addition to the federal constitution, Macias claims the AHC statute violates the Illinois Constitution. The claim is forfeited, however, since he offers no argument on this specific claim. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited ***."). Nonetheless, we note this court has repeatedly found laws prohibiting felons from possessing firearms valid under the Illinois Constitution. See *Kelley*, 2024 IL App (1st) 230569, ¶¶ 23-26; *Travis*, 2024 IL App (3d) 230113, ¶¶ 38-43; *Stephens*, 2024 IL App (5th) 220828, ¶¶ 40-44.

¶ 36　　For these reasons, we find Macias's constitutional challenges without merit.

¶ 37　　　　　　　　　III. CONCLUSION

¶ 38　　Based on the foregoing, we affirm the judgment of the circuit court.

¶ 39　　Affirmed.

___

*People v. Macias*, 2025 IL App (1st) 230678

___

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-10640; the Hon. Alfredo Maldonado, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Kimberly Jansen, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, David B. Greenspan, and James J. Stumpf, Assistant State's Attorneys, of counsel), for the People. |