2026 IL App (2d) 240721-U
No. 2-24-0721
Order filed January 2, 2026

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

___

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

___

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 22-CF-237 |
| MARCO A. TAPIA, | ) ) ) | Honorable Jody Patton Gleason, |
| Defendant-Appellant. | ) | Judge, Presiding. |

___

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Mullen concurred in the judgment.

**ORDER**

¶ 1   *Held*:   Defendant's conviction for unlawful possession of a weapon by a felon is affirmed where: (1) the trial court did not abuse its discretion in refusing to instruct the jury on the necessity defense; and (2) the unlawful possession of weapon by a felon statute is constitutional, both facially and as applied to defendant.

¶ 2   Following a jury trial in the circuit court of Kendall County, defendant, Marco A. Tapia, was convicted of unlawful possession of a weapon by a felon (UPWF) (720 ILCS 5/24-1.1(a) (West 2022)) and sentenced to two years' imprisonment to be followed by six months of mandatory supervised release.  Defendant appeals, arguing that (1) the court erred in refusing to instruct the jury on the affirmative defense of necessity; and (2) section 24-1.1(a) of the Criminal

Code of 2012 (Criminal Code) (*id*.) is unconstitutional under the test articulated by the United States Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022), both on its face and as applied to defendant. We affirm.

¶ 3                                  I. BACKGROUND

¶ 4     The following evidence was adduced at trial. Defendant, a 38-year-old journeyman from San Antonio, Texas, worked as a traveling electrician. In mid-June 2022, he picked up a camper trailer in Mission, Texas, attached it to his truck, and departed for Illinois for a job assignment. Although he usually traveled with coworkers, this was the first time that his family accompanied him. Traveling with him were his common-law wife, Halley Hernandez, his 15-year-old stepdaughter, Katherine, and his 1-year-old son. The 28-hour trip included one break, when he "lost a day" due to a tire blowout. At about 6 or 7 p.m. on June 15, 2022, they arrived at Hide-A-Way Lakes, which is a campground in Yorkville, Illinois. Defendant set up the campsite and went to sleep around 9 or 10 p.m., as he was scheduled to begin work the following morning.

¶ 5     At approximately 10:30 p.m., Deputy Stewart Blouin of the Kendall County Sheriff's Office received a phone call from Gabriela Reyes, a resident of Texas. Reyes requested a wellness check on her younger sister, Katherine. She informed Deputy Blouin that defendant was a felon who had previously abused Katherine. Reyes explained that she had not spoken with her sister for some time and had received text messages from her that appeared unusual, leading her to worry that someone other than Katherine was sending them. Reyes stated that her phone contained a location-tracking application that showed Katherine's phone near Hide-A-Way Lakes. She told Blouin that Katherine might be with her mother and defendant, and she provided Blouin with defendant's phone number and a description of his vehicle.

¶ 6    Deputy Blouin called defendant and inquired about Katherine. Defendant, who had been asleep, was awakened by his wife and answered the call. Blouin testified that he identified himself during the phone call, explained that he wished to check on Katherine, and requested to see her in person to ensure her safety. According to Blouin, defendant confirmed that Katherine was with him but refused to provide any other information. When asked for their location, defendant declined to disclose it, and he did nothing to alleviate Blouin's concerns, such as putting Katherine on the phone. Blouin described defendant as "uncooperative," noting that he would not reveal their location or permit a welfare check. Blouin had no prior interactions with Reyes, Katherine, or defendant, and he was not aware of any contact between them and the Kendall County Sheriff's Office. After the call ended, Blouin did not have sufficient information to confirm that Katherine was safe.

¶ 7    Defendant's recollection of the phone call differed. He testified that as soon as the caller identified himself as law enforcement, he "knew where it was coming from," believing the call had been prompted by Reyes, with whom he had ongoing conflicts and against whom he had previously obtained a restraining order. Defendant acknowledged that he did not give Deputy Blouin an opportunity to explain the purpose of the call. Instead, he told Blouin that he had received a restraining order against Reyes, that she had been harassing him, and he told the deputy to "go F himself, and leave me the hell alone," before hanging up. Defendant maintained that Blouin identified himself only by name before the call ended, and that Blouin's testimony suggesting otherwise was untrue. Defendant further testified that Blouin "never got to say another word" before defendant hung up. "That's all [defendant] let him get out." Defendant then went back to sleep.

¶ 8    Deputy Blouin contacted the Kendall County 911 dispatch center to "get a ping on [defendant's] phone." Using defendant's phone number, dispatch determined that the phone was near Hide-A-Way Lakes, which matched the information provided by Reyes. Blouin gathered as much information as he could but could not find any evidence of child abuse before leaving the sheriff's office to follow up on Reyes' allegation. Even so, he testified that it would be a dereliction of duty not to quickly follow up on the call. Additionally, the sheriff's office had no information to corroborate defendant's claim that Reyes had been harassing him.

¶ 9    Deputy Blouin and Detective Michael Smith proceeded to Hide-A-Way Lakes in separate, fully marked squad cars to conduct the wellness check. They arrived at 1:18 a.m. and located a vehicle with Texas license plates matching the description provided by Reyes. Blouin ran the license plate and confirmed that the vehicle was registered to defendant. It was dark outside, so the officers used flashlights to illuminate the area. Both Blouin and Smith, dressed in full police uniforms equipped with body-worn cameras (bodycams), approached the trailer nearest to the vehicle. They did not know whether the trailer's occupants were asleep. Blouin knocked on the door six times in succession, then stepped back as both officers kept their flashlights trained on the door. Blouin chose not to announce their police presence because, based on his earlier phone call with defendant, he believed defendant would not answer the door if he identified himself as law enforcement.

¶ 10    Defendant testified that he did not hear the knocking but was awakened by his wife, who told him that "they're banging." Defendant testified that his wife "was scared," and he could see "it in her face." She presented her purse to defendant and "was halfway with the pistol in her hand." Defendant knew his wife had a gun, but he did not know where she kept it. Defendant testified that he "did what anybody else would have done" in his position—he retrieved the gun

from the purse and answered the door. He "didn't even have time to process anything," as he was "so tired" and "just reacted off of her [scared] face." Defendant further testified that it never occurred to him that law enforcement might be outside. He believed that no one knew he was in Illinois and thought that the earlier caller had been a police officer in San Antonio rather than local law enforcement. Defendant testified that he was concerned for his family's safety and acted solely to protect them because he knew they were "real close to Chicago," which he described as "one of the toughest cities [with] a lot of crime going on." He acknowledged, however, that the campground was not located in Chicago, he could not see the city skyline from their campsite, and that no one at the campground had threatened his family. Defendant also acknowledged that he did not call out to determine who was at his door or ask his wife any questions about what was happening. He testified that the lock on the trailer door was broken and that he could not see who was outside because the window was covered, although he could see flashlights moving outside.

¶ 11   Approximately 20 seconds elapsed between Deputy Blouin's knocking and the moment defendant opened it. Defendant appeared in the doorway, leaning slightly out of the trailer, holding the pistol in his right hand pointed toward the ground. Defendant testified that he then "saw it was the cops." Blouin said, "Marco?" and defendant replied, "Yeah?" Blouin then noticed the gun and immediately shouted, "put that gun up, first off." Defendant stepped back, and the door briefly swung closed. Blouin testified that he then heard a sound consistent with the racking of a handgun slide, which he testified is associated with "clear[ing] a round out of the chamber." Detective Smith testified that he saw defendant pull back the top of the pistol and observe a round eject from the weapon. During the roughly ten seconds that defendant remained inside the camper, Blouin drew his service weapon and pointed it toward the door because he did not have a clear view of defendant once it closed. Defendant testified that he "undid the gun" and placed it on top of a

microwave near the doorway inside the camper and then exited the trailer. Upon seeing that defendant's hands were empty, Blouin re-holstered his firearm.

¶ 12 The bodycam footage, which was admitted into evidence without objection, shows that defendant then immediately approached Deputy Blouin and began arguing with him. He questioned why the deputy had spoken to him "like that." Blouin responded, "Hey, first off, back the fuck up. I don't know who you talking to." Defendant replied, "Man, shut the fuck up." Blouin then stated, "Now, first off, I talked to you on the phone," to which defendant answered, "I know. And I told you we picked up harassment charges against her daughter." Blouin responded, "I understand that, but you could have been forthcoming with me when I was on the phone with you." They continued to argue.

¶ 13 Defendant testified that he was upset during the encounter because Reyes had previously made numerous unfounded requests for wellness checks and had also called child protective services regarding his family, though no case was ever opened. He further testified that, at the suggestion of law enforcement officers in Texas, he obtained a restraining order against Reyes, but she nevertheless continued to harass him through unfounded wellness checks. He believed he had "already taken care of this shit."

¶ 14 Deputy Blouin responded that the restraining order was irrelevant to the wellness check and reiterated that he needed to see Katherine. When asked where she was, defendant replied that she was asleep inside the trailer and emphasized that it was 1:30 in the morning. Both deputies reiterated that they were there for a wellness check and that they needed to see Katherine. Defendant responded that he did not "give a fuck what you need to do," and continued to complain that the deputies had disturbed his family in the middle of the night, and he directed profanity toward Blouin.

¶ 15    Eventually, Hernandez and Katherine came to the door, and the police confirmed that Katherine was safe, observing no signs of neglect or physical or emotional abuse. Defendant continued to argue with the officers and ultimately disregarded Blouin's instruction to remain outside so they could speak with him, reentering the trailer for the night and closing the door behind him.

¶ 16    Deputy Blouin and Detective Smith then returned to their vehicles and repositioned them just outside the entrance to the campground to maintain surveillance. Because Reyes had informed Blouin that defendant was a felon, Blouin contacted his supervisor to verify defendant's background, as he was aware that felons are prohibited from possessing firearms in Illinois. The deputies also began the process of securing a search warrant.

¶ 17    At approximately 8:00 a.m., investigators executed a search warrant on defendant's trailer and pickup truck. Inside the trailer, they found a firearm inside of a purse. Although no live round was chambered, ammunition was present in the magazine. Investigators recorded the firearm's serial number, and subsequent testing confirmed that it was a functional weapon.

¶ 18    Certified copies of defendant's prior felony convictions for unlawful possession of a controlled substance and unlawful possession of cocaine were admitted into evidence outside the presence of the jury. Before the jury, the parties stipulated that defendant had previously been convicted of possession of a controlled substance and possession of marijuana, both felony offenses, in Texas.

¶ 19    During the jury instruction conference, defendant sought instructions on several affirmative defenses, including the defense of necessity. Defendant argued that he made a *prima facie* showing that there was at least some evidence supporting his claim that committing UPWF was necessary to prevent possible harm to himself, his wife, and his children. The State responded

that defendant presented no evidence that he was in any danger when someone knocked on his door, that he failed to assess the situation or determine what was occurring before taking possession of the weapon, and that he, himself, created the circumstances leading to the heightened police encounter.

¶ 20    The trial court agreed with the State, finding that defendant was neither blameless nor reasonably believed that possessing the weapon was necessary to prevent injury, stating that he had other viable options to address the situation. The court noted that defendant could have refused to answer the door or called 911 to report the banging. It further found there was no actual threat, "other than the fact that somebody had knocked on the door and his wife was handing him a gun."

¶ 21    Following deliberations, the jury found defendant guilty.

¶ 22    Defendant moved for a new trial, arguing that the UPWF statute was unconstitutional both on its face and as applied to him. He further contended that the trial court erred in denying his proposed jury instructions, including the affirmative defense of necessity. The trial court denied the motion, finding that the case law did not support his constitutional challenge and that he had failed to meet his burden of establishing entitlement to the proposed affirmative defense jury instructions.

¶ 23    Following a sentencing hearing, the trial court sentenced defendant to two years' imprisonment and six months of mandatory supervised release.

¶ 24    Defendant timely filed a notice of appeal.

¶ 25                                  II. ANALYSIS

¶ 26    Defendant raises two issues on appeal. First, he contends that the trial court erred in refusing to instruct the jury as to the affirmative defense of necessity because at least some evidence supported giving the instruction. Second, he argues that the UPWF statute violates the

second amendment to the United States Constitution, both on its face and as applied to him. We address these issues in turn.

¶ 27                                        A. Necessity Instruction

¶ 28    A defendant's constitutional rights to due process and trial by jury include the right to have the jury fully and properly instructed as to the law, including the legal principles applicable to the defendant's theory of the case. *People v. Taylor*, 2023 IL App (4th) 220381, ¶ 56. The purpose of jury instructions is to provide the jurors with the legal principles applicable to the evidence presented at trial, so that the jury may reach a correct verdict according to both the law and evidence. *People v. Bannister*, 232 Ill. 2d 52, 81 (2008).

¶ 29    "A defendant is entitled to instructions on his theory of the case when there is *some* foundation in the evidence for the instructions." (Emphasis added.) *People v. Wicks*, 355 Ill. App. 3d 760, 763 (2005). "Only a slight amount of evidence is required to justify giving an instruction." *Id*. To be entitled to an instruction on an affirmative defense, the defendant bears the burden to present some evidence, however slight, to support the affirmative defense. *People v. Washington*, 2012 IL 110283, ¶ 43; *People v. Macias*, 2025 IL App (1st) 230678, ¶ 17. Because jury instructions convey the governing law applicable to the evidence presented at trial and guide the jury toward a proper verdict, the record must contain at least some evidence to justify the instruction.

¶ 30    At the outset, we note that the parties disagree on the appropriate standard of review. Defendant contends that we should review *de novo* the trial court's refusal to instruct the jury on the affirmative defense of necessity. The State, however, maintains that the decision should be reviewed for an abuse of discretion. We agree with the State. The supreme court has held that, "when the trial court, after reviewing all the evidence, determines that there is insufficient evidence

to justify the giving of a jury instruction, the proper standard of review of that decision is abuse of discretion." *People v. McDonald*, 2016 IL 118882, ¶ 42. In reaching this holding, the court clarified language in *Washington*, on which defendant relies, which had suggested *de novo* review was appropriate. See *McDonald*, 2016 IL 118882, ¶¶ 26-42 (resolving parties' dispute concerning the standard of review applicable to the question of whether the trial court erred in finding insufficient evidence to justify the giving of a jury instruction). See also *Taylor*, 2023 IL App (4th) 220381, ¶ 57 (recognizing that under *McDonald*, "when a trial court has determined there is insufficient evidence to support giving a certain jury instruction, that decision is reviewed for an abuse of discretion"); *People v. Boston*, 2016 IL App (1st) 133497, ¶ 36 (reviewing for an abuse of discretion the question of whether the trial court erred in failing to provide a necessity defense instruction to the jury). Thus, we will reverse the trial court's determination that there was insufficient evidence to warrant giving the necessity instruction only where the court's decision is arbitrary, fanciful, or unreasonable such that no reasonable person would adopt the same view. *Macias*, 2025 IL App (1st) 230678, ¶ 17.

¶ 31    Section 7-13 of the Criminal Code (720 ILCS 5/7-13 (West 2022)) governs the affirmative defense of necessity. It provides:

> "Necessity. Conduct which would otherwise be an offense is justifiable by reason of necessity if the accused was without blame in occasioning or developing the situation and reasonably believed such conduct was necessary to avoid a public or private injury greater than the injury which might reasonably result from his own conduct."

Accordingly, to raise the defense of necessity, a defendant must present some evidence that he or she (1) was without blame in occasioning or developing the situation; and (2) reasonably believed that his conduct was necessary to avoid a public or private injury greater than the injury that might

reasonably have resulted from his own conduct. *Taylor*, 2023 IL App (4th) 220381, ¶ 65. The defense is viewed as involving a "choice between two admitted evils where other optional courses of action are unavailable [citations], and the conduct chosen must promote some higher value than the value of literal compliance with the law [citation]." *People v. Janik*, 127 Ill. 2d 390, 399 (1989). Necessity requires "a balancing of two evils." *Id*. at 400. It " 'applies when the threat of harm was immediate and defendant's conduct was the sole option to avoid injury.' " *Id*. (quoting *People v. Guja*, 2016 IL App (1st) 140046, ¶ 47). Moreover, the threat of harm must be " 'specific and immediate.' " *Taylor*, 2023 IL App (4th) 220381, ¶ 65 (quoting *People v. Kite*, 153 Ill. 2d 40, 45 (1992)); see *Guja*, 2016 IL App (1st) 140046, ¶ 47 ("[t]he defense of necessity applies when the threat of harm was immediate, and defendant's conduct was the sole option to avoid injury"). Indeed, such "[p]roof of a 'specific and immediate' threat of harm is a threshold requirement for the defense of necessity." *Macias*, 2025 IL App (1st) 230678, ¶ 20 (quoting *Kite*, 153 Ill. 2d at 45); *People v. Brown*, 2023 IL App (3d) 210460, ¶ 57. "A specific and immediate threat *** constitutes the very nature of a necessity defense; thus, proof of that factor is a threshold requirement for its establishment." *Kite*, 153 Ill. 2d at 45. Where no evidence is presented supporting a specific and immediate threat of harm, a necessity jury instruction should be refused. *Macias*, 2025 IL App (1st) 230678, ¶ 20.

¶ 32    We conclude that the trial court did not abuse its discretion by refusing to instruct the jury on the affirmative defense of necessity. Foremost, the record lacks any evidence that defendant faced a specific and immediate threat of harm. Defendant testified that he was awakened by his wife, who told him that "they're banging" on the door. Defendant could tell by his wife's expression that she was frightened, and she presented her purse to him and "was halfway with the pistol in her hand." Defendant was "so tired" from traveling all day and "didn't even have time to

process anything." He "reacted off of her face" and "did what any man would have done"— he grabbed the gun and opened the door. Defendant further testified that, when he armed himself, he feared for his family's safety because they were "real close to Chicago," which he described as "one of the toughest cities [with] a lot of crime going on."

¶ 33    While an unexpected knock at the door in the middle of the night may have been startling to the trailer's occupants, standing alone, it did not present a " 'specific  and immediate' " threat of harm," which is a threshold requirement for asserting the defense of necessity. See *Macias*, 2025 IL App (1st) 230678, ¶ 20 (quoting *Kite*, 153 Ill. 2d at 45). Nothing about the circumstances suggested that defendant or his family were in danger. No evidence was presented that the individuals outside made any verbal threats, displayed any signs of aggression, or attempted to open the door or otherwise force entry into the trailer. Deputy Blouin's bodycam footage, which was viewed by the jury, showed that he knocked on the door six times and then stepped back to wait; the knocking was brief and not aggressive. Deputy Smith's bodycam, which was also viewed by the jury, did not capture the knocking loudly on its audio track, and defendant was not awakened by the sound of the knocking but by his wife. Having someone knock on the door, even at a late hour, is an ordinary means of seeking attention or requesting contact, and its occurrence in the middle of the night did not, by itself, imply a danger so immediate as to compel defendant to unlawfully arm himself. Moreover, defendant testified that no one had threatened him at the campground at any point, and, in fact, he did not speak with anyone else staying there.

¶ 34    The danger defendant perceived was a generalized fear of the unknown rather than a specific threat of harm. Although defendant testified that he feared "tough[] cities" like Chicago, with "a lot of crime going on," it is well settled that such generalized apprehension is neither specific nor imminent. See *Kite*, 153 Ill. 2d at 47 ("defendant's vague, uncorroborated testimony"

failed to establish a specific and immediate threat); *Macias*, 2025 IL App (1st) 230678, ¶¶ 20-22 (defendant not entitled to necessity instruction where civil unrest following George Floyd's murder presented only a potential threat to people and businesses in defendant's neighborhood, which was too general and remote to constitute a specific and immediate threat); *Taylor*, 2023 IL App (4th) 220381, ¶ 66 ("The mere possibility that [the shooting victim] could have had friends who may have wanted to retaliate [against the defendant] is not evidence of a specific or immediate threat"); *People v. Cord*, 258 Ill. App. 3d 188, 193-94 (1994) (defendant not entitled to necessity instruction where there was "no evidence of a compelling and imminent danger," and his subjective concern about potential danger did not equate to a specific and immediate threat). Accordingly, defendant's generalized fears, which were rooted in unfamiliar surroundings and broad concerns about crime, do not suffice for the threshold requirement of presenting at least slight evidence of a specific and immediate threat. As the trial court aptly observed in denying the jury instruction, "[t]here is no threat, other than the fact that somebody had knocked on the door and [defendant's] wife was handing him a gun," which is a conclusion fully supported by the record.

¶ 35    Even if defendant had presented some evidence of a specific and immediate threat, the trial court would have still been well within its discretion in denying his request for a necessity jury instruction. Regarding the first prong of the necessity defense, there was no evidence, not even "slight," that defendant was without blame in occasioning or developing the situation. On the contrary, the evidence demonstrated that defendant's own conduct escalated a routine welfare inquiry into a heightened late-night encounter with law enforcement. The evidence at trial demonstrated that defendant's initial interaction with law enforcement was not only confrontational but obstructionist. Deputy Blouin testified that when he called defendant, he identified himself and explained that he needed to check on Katherine's welfare. According to

Blouin, defendant confirmed that Katherine was with him, but he refused to provide any other information, including Katherine's location. Blouin described defendant as "uncooperative." Defendant's own testimony confirmed that he was openly hostile with Deputy Blouin during the phone call. He testified that as soon as Blouin identified himself as law enforcement, he assumed the call had been prompted by Reyes and interrupted that he had received a restraining order against Reyes for harassment related to unfounded welfare checks. According to defendant, "[t]hats all [he] let him get out," and Blouin "never got to say another word." Defendant then told Deputy Blouin to leave him "the hell alone" and to "go F himself" before hanging up.

¶ 36 On appeal, defendant argues that, while he "may have been unpleasant over the phone," there was nevertheless at least slight evidence that he was blameless, because he "did nothing illegal" in telling off Deputy Blouin and ending the call. He asserts "there is no law requiring a person to speak to someone who calls, even the police." Defendant's argument misses the point. The relevant question is not whether defendant's conduct was legal, but rather, whether he was "*without blame* in occasioning or developing the situation." (Emphasis added.) 720 ILCS 5/7-13 (West 2022); *Janik*, 127 Ill. 2d at 399. See *Guja*, 2016 IL App (1st) 140046, ¶ 48 (defendant not blameless in occasioning the situation, a physical altercation, where his own testimony showed that he provoked the victim by cursing at her and calling her derogatory names, which caused her to go into a rage); *People v. Sullivan*, 2020 IL App (2d) 180438-U, ¶ 34 (defendant not blameless where, after missing several doses of medication and knowing he would experience side effects if he failed to take it, he was arrested and released with conditions barring him from returning home, yet failed to notify police of his need for medication or seek assistance, choosing instead to reenter the home to retrieve his medication and a change of clothes). While it is true that defendant was not required to remain on the line, his hostile and uncooperative behavior impeded Deputy

Blouin's ability to complete the wellness check by less intrusive means. After the call ended, Blouin was no closer to confirming Katherine's safety than he had been before he placed the call and, if anything, defendant's hostility would have only heightened the concern that something might be wrong. By abruptly hanging up after using profanity, telling the officer to "leave [him] the hell alone," and not providing any assurance of Katherine's safety, defendant created the very situation that necessitated the officers' late-night, in-person welfare check. Additionally, because defendant was hostile during the phone call, Deputy Blouin reasonably chose to knock on the door without verbally announcing his police presence, believing that defendant would refuse to open the door if he identified himself as law enforcement.

¶ 37 Although defendant testified that he believed the deputy's call originated from Texas and therefore did not anticipate that law enforcement might appear at his campsite in Illinois, that belief was patently unreasonable. Earlier that night, defendant had engaged in a heated phone call with law enforcement concerning his stepdaughter's welfare. Regardless of whether Deputy Blouin was able to fully explain the purpose of the call before defendant told him off and hung up, defendant's statements to the officers captured on bodycam make clear that he understood the call concerned a welfare check. At the scene, defendant repeatedly complained that Reyes had previously made unfounded requests for welfare checks and that, because of Reyes' conduct, he had "picked up harassment charges" against her. He also emphasized that he had already provided this information to Blouin over the phone. Thus, regardless of any confusion about the deputy's physical location, defendant knew he was speaking with law enforcement, knew the call involved a child's safety, and knew that he had abruptly ended the call after refusing to cooperate. In short, it defies common sense to believe that a person could swear and hang up on law enforcement conducting a welfare check on a child and reasonably expect the matter to end there. Even if

defendant erroneously believed the call originated in Texas, that misunderstanding was not objectively reasonable and cannot absolve him of blame for creating the situation that necessitated the officers' late-night, unannounced knock at his door. The evidence at trial established that defendant was not an innocent bystander, but rather, that his own confrontational and obstructionist conduct directly precipitated the situation.

¶ 38    Likewise, the trial court did not abuse its discretion in concluding that there was no evidence that defendant's decision to unlawfully possess the firearm was necessary to avoid a private injury greater than the injury which might reasonably result from that conduct. Again, the affirmative defense of necessity involves "the choice between two admitted evils where other optional courses of action are unavailable." *Janik*, 127 Ill. 2d at 399. "Necessity requires that there be an alternative to an evil course and that alternative be evil as well. Where there is yet another alternative besides the two evil choices and such alternative, if carried out, will cause less harm, then a person is not justified in breaking the law." *People v. White*, 78 Ill. App. 3d 979, 981 (1979). "Conduct that would otherwise be illegal is justified by necessity only if the conduct was the sole reasonable alternative available to the defendant under the circumstances." *People v. Kratovil*, 351 Ill. App. 3d 1023, 1034 (2004).

¶ 39    Here, defendant had several lawful options available to him other than illegally possessing the firearm. As the trial court observed, defendant could have called 911 to report that someone was knocking on his door in the middle of the night. He also could have simply remained inside the camper and verbally inquired who was outside before taking any further action. Although defendant testified that the lock on the door did not function properly, there was no evidence that the individuals outside tried to open the door or otherwise gain entry to the trailer, as noted above. Additionally, defendant's wife, the owner of the firearm, was present and could have addressed

the situation without violating the law. Because reasonable and lawful alternatives existed to defendant illegally arming himself, there was no evidence that violating the law was the sole reasonable option available to him. Accordingly, the court did not abuse its discretion in denying defendant's request for a necessity jury instruction.

¶ 40                    B. Constitutionality of the UPWF Statute

¶ 41    Defendant next argues that, under the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n. v. Bruen*, 597 U.S. 1 (2022), the UPWF statute under which he was convicted, section 24-1.1(a) of the Criminal Code, violates the second amendment to the United States Constitution on its face and as applied to him. Specifically, he contends that "Illinois' overreaching, permanent ban on firearm possession" by individuals with non-violent felony convictions is inconsistent with our country's historical tradition of firearm regulation.

¶ 42    Section 24-1.1(a) of the Criminal Code provides in relevant part:

"(a) It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business *** any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction." 720 ILCS 5/24-1.1(a) (West 2024).

¶ 43    In analyzing the constitutionality of the UPWF statute, we are guided by several well-settled principles. Statutes enjoy a strong presumption of constitutionality. *Rowe v. Raoul*, 2023 IL 129248, ¶ 20. This is because the legislature is principally tasked with establishing the public policy of our state. *Id*. The party challenging a statute bears the burden of clearly establishing its invalidity. *People v. McKown*, 2022 IL 127683, ¶ 29. " 'Constitutional challenges carry the heavy burden of successfully rebutting the strong judicial presumption that statutes are constitutional.' " *People v. Rizzo*, 2016 IL 118599, ¶ 23 (quoting *People v. Patterson*, 2014 IL 115102, ¶ 90).

¶ 44    The constitutionality of a statute may be challenged either facially or as applied in a particular case. *People v. Hilliard*, 2023 IL 128186, ¶ 21. A statute is facially unconstitutional only if there is no circumstance in which it could be validly applied. Indeed, "[a] party raising a facial challenge to a statute faces a particularly heavy burden." *People v. Bochenek*, 2021 IL 125889, ¶ 10. Because a statute is facially unconstitutional only if it is unconstitutional in every instance, a facial challenge is "the most difficult challenge to mount successfully." *Napleton v. Village of Hinsdale*, 229 Ill. 2d 296, 306 (2008). Under such a challenge, the specific facts and circumstances of the challenging party are irrelevant. *People v. Thompson*, 2015 IL 118151, ¶ 36.

¶ 45    Conversely, an as-applied challenge requires a showing that the statute violates the constitution as it applies to the particular facts and circumstances of the challenger. *Hilliard*, 2023 IL 128186, ¶ 21. The distinction between the two " 'goes to the breadth of the remedy employed by the court.' " *People v. Travis*, 2024 IL App (3d) 230113, ¶ 35 (quoting *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 331 (2010)). "If a [challenger] prevails in an as-applied claim, he may enjoin the objectionable enforcement of the enactment only against himself, while a successful facial attack voids the enactment in its entirety and in all applications." *Napleton*, 229 Ill. 2d at 306.

¶ 46    If reasonably possible, a court must construe a statute to uphold its constitutionality. *People v. Relerford*, 2017 IL 121094, ¶ 30. The issue of whether a statute is constitutional is a question of law, which we review *de novo*. *People v. Davis*, 2014 IL 115595, ¶ 26.

¶ 47    In *Bruen*, the United States Supreme Court recognized that the second and fourteenth amendments protect the right of an ordinary, law-abiding citizen to possess a handgun both inside and outside the home for self-defense (*Bruen*, 597 U.S. at 8-10), and it announced a two-part test for assessing the constitutionality of firearm regulations. First, courts must determine whether the

"plain text" of the second amendment covers a person's conduct and, if so, "the Constitution presumptively protects that conduct." *Id*. at 24. The State then "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id*. (quoting *Konigsberg v. State Bar of California*, 366 U.S. 35, 50, n. 10 (1961)). In other words, *Bruen* requires a threshold textual inquiry that asks whether the plain language of the second amendment covers the challenger's conduct. *Bruen*, 597 U.S. at 24. If so, the burden shifts to the State to demonstrate that the challenged statute or regulation is consistent with our nation's historical tradition of firearm regulation. *Id*. "In performing the historical analysis required by the second step of the *Bruen* test, courts are required to use analogical reasoning to determine whether regulations from the nation's founding are 'relevantly similar' to the current regulation on review." *People v. Daniels*, 2025 IL App (1st) 230823, ¶ 41 (quoting *Bruen*, 597 U.S. at 28-29).

¶ 48   Pursuant to *Bruen*, then, we first consider whether the "plain text" of the second amendment covers defendant's conduct. The second amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. Here, defendant contends that the conduct proscribed by the UPWF statute, possession of a firearm by a convicted felon, is covered by the plain text of the second amendment and is therefore presumptively protected by the constitution.

¶ 49   Defendant's argument fails because the plain text of the second amendment does not encompass felons, who are not included within "the people" referenced in that amendment. In *Bruen*, consistent with its earlier opinions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the United States Supreme Court

recognized that the second and fourteenth amendments protect the rights of ordinary, *law-abiding* citizens to possess handguns for self-defense. (Emphasis added.) *Bruen*, 597 U.S. at 8-9. See *Heller*, 554 U.S. at 626 (recognizing that the second amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," while cautioning that the right "is not unlimited" and that nothing in the Court's opinion "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill"); *McDonald*, 561 U.S. at 786 (plurality opinion) (reiterating that *Heller* "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' " (quoting *Heller*, 554 U.S. at 626)). Indeed, *Bruen* repeatedly described the second amendment as applying to law-abiding citizens. See *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 99 (observing that *Bruen* "characterized the holders of second amendment rights as 'law-abiding citizens' no fewer than fourteen times"); *People v. Baker*, 2023 IL App (1st) 220328, ¶ 37 (noting that *Bruen* "could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant," and observing that, "[j]ust in case a reader missed the first time that the court said it, the court repeated it 18 times").

¶ 50       In the wake of *Bruen*, the Illinois Appellate Court has routinely rejected facial constitutional challenges to statutes prohibiting felons from possessing firearms on the ground that felons are not within the class of individuals protected by the second amendment. See, *e.g.*, *People v. Rich*, 2025 IL App (1st) 230818, ¶ 63 (rejecting challenge to the UPWF statute at the first step of the *Bruen* analysis because "possessing a firearm while having a felony conviction falls [outside] the scope of the second amendment"); *People v. Welch*, 2025 IL App (1st) 231116, ¶ 57 ("Because the second amendment only protects the rights of law-abiding citizens to bear arms, the

*Bruen* analytical framework does not apply to the [offense of] UPWF"); *People v. Boss*, 2025 IL App (1st) 221855, ¶ 33 ("the second amendment does not apply to a felon's firearm possession"); *People v. Cadengo*, 2025 IL App (4th) 240568, ¶¶ 72 ("Because of defendant's felony conviction, she is not a 'law-abiding citizen,' so the second amendment's guarantees to [*sic*] do not apply to her"); *People v. Kelly*, 2024 IL App (1st) 230569, ¶ 22 (rejecting the defendant's facial challenge to the armed habitual criminal (AHC) statute, stating "*Bruen* is clear that second amendment rights apply to law-abiding citizens for self-defense," and concluding that "Illinois is at liberty to restrict felons' rights to bear arms"); *People v. Burns*, 2024 IL App (4th) 230428, ¶ 21 (holding that the defendant, as a felon, was not a law-abiding citizen, and he therefore could "not show that [the UPWF statute] violates the second amendment on its face under the *Bruen* framework"); *People v. Hatcher*, 2024 IL App (1st) 220455, ¶ 54 (observing that *Bruen* "limits the second amendment's scope to (1) citizens who are (2) law-abiding and (3) responsible, and (4) who use firearms for self-defense"); *People v. Mobley*, 2023 IL App (1st) 221264, ¶ 28 (rejecting the defendant's ability to utilize the *Bruen* framework to challenge the constitutionality of the UPWF statute as applied to him because "*Bruen* strongly suggests the test only applies when a regulation impacts a law-abiding citizen's ability to keep and bear arms"); *Baker*, 2023 IL App (1st) 220328, ¶ 37 (holding *Bruen* does not apply to "felons like defendant" and that, "[b]ased on the plain, clear, and repeated language of the justices in the majority, [the] defendant is simply outside the box drawn by *Bruen*"); *People v. Boyce*, 2023 IL App (4th) 221113-U, ¶ 16 (upholding UPWF statute and observing that *Bruen* "does not apply to felons").

¶ 51    Indeed, this court has consistently rejected arguments like those that defendant raises here. See *People v. Miller*, 2024 IL App (2d) 230545-U, ¶ 15 (rejecting facial constitutional challenge to the AHC statute, as the protections afforded by the second amendment "do not extend to

felons"); *People v. Echols*, 2024 IL App (2d) 220281-U, ¶ 153 (upholding UPWF statute, observing, "As defendant does not dispute that he is a convicted felon for purposes of the unlawful-possession-of-a-weapon-by-a-felon statute, he is not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' referenced in the second amendment"); *People v. Gross*, 2024 IL App (2d) 230017-U, ¶ 24, 29 (upholding UPWF statute, holding that " 'the people' referenced in the second amendment are law-abiding citizens," and further concluding that, as a felon, the defendant was not a member of the class of individuals protected by that amendment); *People v. Smith*, 2023 IL App (2d) 220340-U, ¶ 57, *pet. for leave to appeal pending*, No. 130343 (filed Jan. 24, 2024) (rejecting a second-amendment challenge under *Bruen* to the AHC statute and stating that the defendant was "not a 'law-abiding' citizen afforded the same second amendment protections enjoyed by 'the people' reference[d] in the second amendment").

¶ 52    Relying on *Brooks*, defendant argues that the first step of the *Bruen* analysis requires courts to review a defendant's conduct rather than his status as a felon.  In other words, he contends that a defendant's status as a felon is irrelevant to whether he is entitled to second amendment protections, and therefore his possession of a firearm was presumptively protected.

¶ 53    Numerous courts, including this appellate district, have already rejected that precise reading of *Bruen* and declined to follow *Brooks.*  Instead, they have adopted the reasoning in *Baker*, in which the First District rejected the defendant's as-applied constitutional challenge to the UPWF statute because *Bruen* simply did "not apply" to defendant, who was a felon.  See *Miller*, 2024 IL App (2d) 230545-U, ¶¶ 17-18 (rejecting *Brooks'* interpretation of the first step of the *Bruen* framework as "too narrow" and instead following *Baker*); *People v. Martinez*, 2024 IL App (2d) 230305-U, ¶¶ 28-35, *pet. for leave to appeal pending,* (filed Oct. 16, 2024) (declining to follow *Brook's* reasoning as to the first step of the *Bruen* framework and instead joining the "great

weight of authority in Illinois and agree[ing] that the second amendment does not apply to a felon's firearm possession," consistent with *Baker*); *Whitehead*, 2024 IL App (1st) 231008-U, ¶¶ 81-82, 85 (rejecting *Brooks*, following *Baker*, and holding that a defendant's felony status is relevant at the first step of the *Bruen* framework because the conduct regulated by the AHC statute is not firearm possession in the abstract, but possession of a firearm by a felon); *People v. Wright*, 2024 IL App (1st) 230428-U, ¶ 20 (declining to follow *Brooks* and instead following *Baker*); *People v. Carldwell*, 2024 IL App (1st) 230968-U, ¶¶ 21-22 (same); and *Mobley*, 2023 IL App (1st) 221264, ¶¶ 27-28 (same). We reject defendant's contention that his status as a felon is irrelevant under *Bruen* and, consistent with the growing consensus in the Illinois Appellate Court, we likewise conclude that a felon's possession of a firearm is not presumptively protected under the second amendment. Because felons are not included within "the people" referenced in the second amendment, defendant's challenge to the UPWF statute therefore fails at the first step of the *Bruen* framework.

¶ 54    Defendant additionally argues that the UPWF statute is unconstitutional as applied to him because there is no "relevantly similar historical practice that prohibited firearm possession based on decades-old nonviolent offenses—much less for an individual who had never committed a violent offense." Although he concedes two felony convictions from Texas in 2009, defendant emphasizes that the offenses involved nonviolent drug possession and that he has since rehabilitated himself by attending church, participating in Alcoholics Anonymous, and getting "clean." In defendant's view, the UPWF statute casts "too wide of a net" to be analogous to historical firearm restrictions because it permanently bars him from possessing a firearm even though his predicate offenses were committed "while suffering from addictions early in adulthood" and did not involve violence. In contrast to facial challenges, an as-applied challenge requires the

challenging party to show that the statute violates the constitution as it applies to his particular facts and circumstances. *Hilliard*, 2023 IL 128186, ¶ 21. We review that question *de novo*. *Davis*, 2014 IL 115595, ¶ 26.

¶ 55     Defendant's as-applied challenge fails because Illinois courts have repeatedly rejected the argument that the prohibition on firearm possession by felons under the UPWF statute, as applied to nonviolent felons, violates the second amendment. *Welch*, 2025 IL App (1st) 231116, ¶ 60 (holding that the violent or nonviolent nature of prior convictions is irrelevant because felony status alone places the defendant outside the scope of the second amendment under *Bruen*); *Travis*, 2024 IL App (3d) 230113, ¶¶ 36-37 (rejecting the argument that nonviolent felonies warrant different second amendment treatment because the UPWF statute prohibits firearm possession by all felons, "irrespective of the violent or nonviolent nature of his convictions"). Indeed, our appellate district has consistently adhered to this reasoning. *Echols*, 2024 IL App (2d) 220281-U, ¶ 156 ("[w]hether defendant's qualifying convictions were 'nonviolent' is irrelevant, as the Supreme Court placed no qualifiers on the word 'felons' in either *Heller* or *McDonald*"); *Gross*, 2024 IL App (2d) 230017-U, ¶ 27 ("[n]either *Heller* nor *Bruen* qualified the term 'felon' or otherwise limited it to violent felons"). Numerous unpublished orders are in accord. See, *e.g.* *People v. Hicks*, 2025 IL App (1st) 241783-U, ¶¶ 28-29; *People v. Smith*, 2025 IL App (1st) 231605-U, ¶¶ 35-37; *People v. Johnson*, 2025 IL App (3d) 240185-U, ¶ 12; and *People v. Crockrum*, 2025 IL App (1st) 241373-U, ¶¶ 28-29. See also *Medina v. Whitaker*, 913 F.3d 152, 159 (D.C. Cir. 2019) (noting that "[f]elonies encompass a wide variety of non-violent offenses, and we see no reason to think that the [Supreme] Court meant 'dangerous individuals' when it used the word felon"). Because defendant's nonviolent predicate offenses do not alter his status as a felon under *Bruen*, his as-applied challenge to the UPWF statute necessarily fails.

¶ 56                                    III. CONCLUSION

¶ 57    For the above reasons, we affirm the judgment of the circuit court of Kendall County.

¶ 58    Affirmed.