2026 IL App (2d) 250047-U
No. 2-25-0047
Order filed May 13, 2026

**NOTICE:** This order was filed under Illinois Supreme Court Rule 23(b) and is not precedential except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,

v.

KENNETH LEMAR PRICE, JR., Defendant-Appellant.

Appeal from the Circuit Court of McHenry County.
Honorable Mark R. Gerhardt, Judge, Presiding.
No. 23-CF-1165

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices McLaren and Mullen concurred in the judgment.

## ORDER

¶ 1    *Held*: (1) The State proved that defendant constructively possessed a gun to support convictions for armed habitual criminal and unlawful possession of a firearm by a felon; (2) the State proved defendant guilty of child endangerment; (3) the armed habitual criminal and unlawful possession of a firearm by a felon statutes are not facially unconstitutional under the second amendment; and (4) the same statutes are not unconstitutional as applied to defendant.

¶ 2    On January 4, 2024, defendant Kenneth Lemar Price, Jr. was indicted, along with codefendants Daniel Hawkins and Desiree Crowcroft (both nonparties to this appeal), of: unlawful possession with intent to deliver cocaine (720 ILCS 570/401(a)(2)(A) (West 2022)) (count 15); armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2022) (count 16); unlawful possession with intent to deliver fentanyl (720 ILCS 570/201(a)(1.5)(A) (West 2022)) (count 17); unlawful

possession of cocaine (720 ILCS 550/5(e) (West 2022)) (count 18); unlawful possession with intent to deliver cannabis (*id.*) (count 19); unlawful possession of cannabis (*id.* § 4(e)) (count 20); unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2022)) (count 21); unlawful possession of ammunition by a felon (*id.*) (count 22); unlawful possession of fentanyl (720 ILCS 570/402(c) (West 2022)) (count 23); endangering the life or health of a child (720 ILCS 5/12C-5(a)(2) (West 2022)) (count 24); and resisting a peace officer (*id.* § 31-1) (count 25). Prior to trial, the State nol-prossed the two charges related to the unlawful possession of fentanyl (counts 17 and 23) and the resisting a peace officer charge (count 25). Defendant was convicted of the remaining charges following a bench trial and received concurrent sentences totaling 14 years in prison. Defendant appeals his convictions for unlawful possession of a firearm, unlawful possession of ammunition, armed habitual criminal, and child endangerment. For the following reasons, we affirm in part and dismiss in part.

¶ 3                                          I. BACKGROUND

¶ 4      The following facts were established during the bench trial on defendant's charges conducted on December 4 and 5, 2024.

¶ 5      Anthony Crawford, a McHenry County Sheriff's Office detective in the intelligence-led police unit, testified that he was part of a team of deputies that surveilled and ultimately executed a search warrant on a residence at 1122 West Oakleaf Avenue in McHenry[1] on December 12, 2023. Crawford stated that he was familiar with defendant and his girlfriend Crowcroft prior to executing the search warrant. The surveillance team arrived at the residence around noon and ultimately entered the residence around 6 p.m. prior to obtaining a search warrant.

---

[1] In its briefs in this court and the trial court, the State asserts that the address is in Johnsburg. However, the search warrant for the residence and the trial testimony all state that it is in McHenry.

¶ 6     Crawford described the layout of the residence.  He said that the front door opens into the living room, which is connected to the kitchen, and the stairs to a basement were "off the kitchen." Down a hallway are three bedrooms and a bathroom.  Crawford believed at least two rooms were for children because they contained children's clothing and toys.  The third bedroom was the master bedroom with an ensuite bathroom.  Crawford thought it was "obvious" that the master bedroom had "a couple people" living in it.

¶ 7     While the deputies were inside the residence waiting for a search warrant, Crawford said that defendant came inside and attempted to force his way past the deputies toward the bedrooms. He said that defendant was aggressive and screamed at the deputies that he would sue them because they did not have a warrant.  The deputies received the search warrant a few hours after they first entered the home. Crawford's primary role during the execution of the search warrant was to photograph and collect the evidence that was found.  Photos Crawford took of the residence were entered into evidence.

¶ 8     In the master bedroom, the deputies found several items with defendant's name, including a Link card, a written traffic warning from Woodstock dated November 13, 2021, a traffic citation from Mundelein dated October 28, 2023, a check dated April 27, 2012, and a sentencing order from the circuit court of McHenry County dated November 14, 2023.  However, none of these items contained the address of the residence.

¶ 9     Crawford said they also found in the master bedroom two digital scales and a clear knotted plastic bag containing a chunky white substance inside a brown paper bag on the TV stand.  He conducted a field test on one of the scales, which showed positive for cocaine.  Inside the master bedroom closet, they found a clear knotted plastic bag containing a powdery white substance inside

- 3 -

a purple jacket. In the same closet, a loaded Sig Sauer P226 pistol was found on the top shelf inside a purse.

¶ 10　In a kitchen drawer, Crawford said they found a vacuum-sealed bag containing a leafy green substance. In the basement under the stairs, they found a cardboard box containing multiple vacuum-sealed bags, each with a leafy green substance inside. The box had a shipping label with defendant's name on it. Near the box were clear zip-top bags, which Crawford said were commonly used for packaging drugs for sale.

¶ 11　As part of his investigation into defendant, Crawford said he used various "open source methods" including viewing defendant's public Facebook profile. Crawford found a photo on Facebook showing defendant wearing a jacket similar to the one that was found in the residence containing the powdery white substance. The Facebook photo was entered into evidence. Crawford additionally opined, based on his experience in narcotics investigations, that the health or lives of the children inside the residence were in danger because of the presence of the drugs.

¶ 12　Gabriela Valencia, a narcotics detective with the McHenry County Sheriff's Office, testified that she assisted with the surveillance and execution of the search warrant at the residence. She explained that at around 6 p.m., they observed five children on a couch inside the residence, but they did not see any vehicles in the driveway or any adults inside. They then attempted to enter the residence to conduct a wellness check on the children. After an adult answered the door, they entered and held the residence in anticipation of a search warrant. She stated that defendant arrived at the residence and attempted to force his way past her by pushing her and grabbing her wrists and arms. She believed that he was trying to access the hallway that led to the bedrooms. Valencia said that Defendant subsequently left the residence.

¶ 13    On cross-examination, Valencia stated that she saw Hawkins leave the residence while conducting surveillance. Hawkins was later pulled over by McHenry sheriff's deputies and found with drugs inside the vehicle. This information was used as part of the basis to obtain the search warrant for the residence. She also admitted that they allowed two females who came to the residence to unlock and enter the two children's bedrooms under the deputies' supervision.

¶ 14    Amanda Darnell, a forensic firearms examiner for the Illinois State Police, testified that she examined the gun that was recovered at the residence. The gun fired when she tested it and the bullets that were found with the gun appeared to be live rounds.

¶ 15    Michelle Etheridge, a technician with the Illinois State Police crime lab, testified as an expert in drug chemistry. She tested the substances recovered during the search of the residence. The leafy green substance, weighing 942 grams, contained cannabis. The chunky white substance, weighing 4.881 grams, contained cocaine. The powdery white substance, weighing 27.944 grams, also contained cocaine. Based on her testing and experience, she believed the green substance was cannabis and the two white substances were cocaine.

¶ 16    Nicholas Clesceri, a McHenry County Sheriff's Office detective who led the surveillance and search of the residence, testified as an expert in street level narcotics distribution and distribution methodology. He stated that the powdery white substance was powder cocaine and the chunky white substance was crack cocaine. He opined that there was a larger amount of the powder cocaine because sellers will buy a large amount and mix it with baking soda to make crack cocaine. He stated that the two types of cocaine recovered from the property were packaged for delivery and were in quantities that indicated it was for sale, not personal use. He similarly opined that the packaging and quantity of the cannabis was for sale, not personal use.

¶ 17    On cross-examination, Clesceri acknowledged that the residence was searched again later in the year with Crowcroft as the "target." A "large amount of illegal drugs" were recovered during that search. He also stated that he believed that defendant and Crowcroft were in a dating relationship, had a child together, and had sold illegal drugs together. He also admitted that there were no drug cooking materials found at the residence, nor was there any cash. He stated, though, that in his experience drug dealers often keep their drugs and cash separate to avoid civil asset forfeiture.

¶ 18    The trial court took judicial notice of defendant's prior felony convictions for unlawful delivery of a controlled substance and unlawful possession with intent to deliver a controlled substance (McHenry County case nos. 12-CF-889, 13-CF-801). The State rested and defendant did not present any evidence. Following closing arguments, the trial court found defendant guilty of all charges. The trial court rejected defendant's argument that none of the contraband belonged to defendant. The trial court stated that it was "difficult to swallow" this argument given the jacket that belonged to defendant with drugs in the pocket, the various traffic tickets and sentencing orders, the Link card, the check, and the box with defendant's name on the shipping label. The trial court thus concluded, "He's there. He knows. It's his."

¶ 19    Defendant was sentenced to concurrent terms of 14 years in prison each on the unlawful possession with intent to deliver cocaine (count 15) and armed habitual criminal convictions (count 16), 5 years for the possession with intent to deliver cannabis conviction (count 19), and 4 years for the unlawful possession of ammunition conviction (count 22). The trial court sentenced defendant to no jail or prison time and assessed "zero fine" for the child endangerment conviction (count 24). The remaining convictions (counts 18, 20, and 21) merged into their respective greater offenses. After unsuccessfully moving for a new trial, defendant timely appealed.

¶ 20                                II. ANALYSIS

¶ 21     Defendant first argues that the State did not prove his convictions for armed habitual criminal, unlawful possession of a firearm, and unlawful possession of ammunition beyond a reasonable doubt because the State did not prove that he had constructive possession of the firearm or ammunition.

¶ 22     In evaluating the sufficiency of the evidence, it is not the province of this court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The relevant question is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The weight to be given to the witnesses' testimony, the determination of their credibility, and the reasonable inferences to be drawn from the evidence are all matters within the jurisdiction of the trier of fact. *People v. Smith*, 185 Ill. 2d 532, 542 (1999); *Collins*, 106 Ill. 2d at 261-62. Likewise, the resolution of any conflicts or inconsistencies in the evidence is also within the province of the fact finder. *Collins*, 106 Ill. 2d at 261-62. This standard applies whether the evidence is direct or circumstantial and whether the verdict is the result of a jury trial or a bench trial. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000).

¶ 23     We will set aside a criminal conviction only "where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542. However, we bear in mind that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); see also *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008). "Simply stated, the fact that defendant is 'probably guilty' does not equate with guilt beyond a reasonable doubt." *People v. Ehlert*, 211 Ill. 2d 192, 213

(2004). If, after a careful examination of the evidence, we "are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction." *Smith*, 185 Ill. 2d at 541; see also *People v. Hernandez*, 312 Ill. App. 3d 1032, 1036 (2000) ("That is, a criminal conviction cannot stand on appeal if the prosecution's evidence is so weak as to create a reasonable doubt as to defendant's guilt."). Although the determinations of the trier of fact are given great deference, they are not conclusive. *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 24    Possession of contraband can be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). "Actual possession is proved by testimony that the defendant exercised some form of dominion over the firearm, such as that he had it on his person, tried to conceal it, or was seen to discard it." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 27. " '[C]onstructive possession of a firearm may be shown where the person has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area where the firearm is found.' " *People v. Wise*, 2021 IL 125392, ¶ 25 (quoting *People v. Brown*, 2020 IL 124100, ¶ 11). "Control is established when the defendant has the 'intent and capability to maintain control and dominion' over the weapon, 'even if he lacks personal present dominion over it.' " *People v. Brooks*, 2023 IL App (1st) 200435, ¶ 41.

¶ 25    "Habitation in the premises where contraband is discovered is sufficient evidence of control to constitute constructive possession." *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Proof of residency, such as rent receipts, utility bills, or clothing in closets, "is relevant to show the defendant lived on the premises and therefore controlled them." *Id.* Additionally, " '[t]he law is clear that the exclusive dominion and control required to establish constructive possession is not diminished by evidence of others' access to the contraband.' " *Givens*, 237 Ill. 2d at 338.

Constructive possession is often proven entirely by circumstantial evidence. *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 18. "In deciding whether constructive possession has been shown, the trier of fact is entitled to rely on reasonable inferences of knowledge and possession, absent other factors that might create reasonable doubt as to the defendant's guilt." *Spencer*, 2012 IL App (1st) 102094, ¶ 17; see *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992).

¶ 26    Here, defendant argues that the State failed to prove him guilty beyond a reasonable doubt because there was insufficient evidence that he knew about the firearm or that he lived at the residence. In support of his argument, defendant relies on *Fernandez*, 2016 IL App (1st) 141667, *People v. Sams*, 2013 IL App (1st) 121431, *People v. Day*, 51 Ill. App. 3d 916 (1977), and *Wise*, 2021 IL 125392.

¶ 27    In *Fernandez*, the defendant was charged with one count of possession with intent to deliver over 900 grams of heroin and eight counts of unlawful use of a weapon by a felon after the police raided a home where defendant was suspecting of selling drugs. 2016 IL App (1st) 141667, ¶ 4. In the bedroom of the home, police found a passport and insurance card that belonged to the defendant, but neither listed the defendant's address. *Id.* ¶ 11. They also found framed pictures of the defendant with a woman throughout the house and men's and women's clothes in the bedroom closet. A gun was recovered from underneath the bed in the bedroom. *Id.* Police also found heroin, a gun, and several boxes of ammunition underneath the hood of a broken van with flat tires in the garage. *Id.* ¶ 12. Police eventually found the defendant in possession of keys to the home when he was arrested. *Id.*

¶ 28    The appellate court reversed the defendant's convictions because the evidence was insufficient to establish the defendant's residency at the home. *Id.* ¶ 19. The court determined that none of the evidence that was found at the home linked the defendant's residence to that home,

and the trial evidence established that the defendant received mail at a different address. *Id.* The court also determined that "the presence of an unidentified man on the premises at the time police executed the search warrant weighs against a finding that [the defendant] maintained control over the premises." *Id.* ¶ 21. Moreover, the court determined that the hidden nature of the gun and the lack of evidence placing the defendant in the home on the day of the raid created a reasonable doubt as to the defendant's knowledge of the gun. *Id.*

¶ 29 In *Sams*, the defendant was convicted of unlawful use of a weapon by a felon. 2014 IL App (1st) 121431, ¶ 1. Two callers informed police of an incident in Chicago Heights. *Id.* ¶ 4. The first caller merely informed the police of the incident but did not provide details. *Id.* The second stated that a man pointed a gun at her son. *Id.* After questioning by the dispatcher, the second caller identified the man as the defendant. *Id.* However, the caller did not indicate whether she saw the man or received the information second hand, nor did she give a description of the man or the gun. *Id.* When police arrived at the location of the incident, the defendant exited the residence and was arrested. *Id.* ¶ 5. The first time police entered the home, they found it in a state of disarray and there was an apparent bloodstain on the couch. *Id.* Upon reentering the home, police found a shotgun under the couch and a live round under the end table. *Id.* Police never saw anyone in possession of the gun or ammunition. *Id.*

¶ 30 The appellate court reversed the defendant's conviction because the State failed to prove that the defendant possessed the gun. *Id.* ¶ 11. The court determined that the information given by the second caller did not establish the defendant's possession of the gun because the caller did not describe the alleged offender or gun and did not state how she learned the information. *Id.* ¶ 12 Moreover, the information provided by the police also did not establish that the defendant possessed the gun. *Id.* ¶ 13. The police never saw the defendant in possession of the gun and there

was no physical evidence tying the defendant to the home or the gun. *Id.* Indeed, the State conceded that the defendant did not live at the home in which the gun was found. *Id.* ¶ 14. Rather, the evidence showed that the defendant merely walked out of a house in which a gun was later found, which is insufficient to establish constructive possession. *Id.* ¶ 13. Therefore, the appellate court determined that the State failed to prove the defendant's conviction beyond a reasonable doubt. *Id.* ¶ 16.

¶ 31　In *Day*, the defendant was convicted for the unlawful possession of cannabis after it was found in the car he was driving with six other passengers inside. 51 Ill. App. 3d at 916-17. The cannabis was found on the floor at the legs of the passenger sitting next to the defendant. *Id.* The appellate court reversed the defendant's conviction, determining that the bag of cannabis could have belonged to someone other than the defendant. *Id.* at 918. The defendant's "status as owner-driver of the vehicle does not put him into possession of everything within the passenger area when there are passengers present who may, in fact, be the ones in possession of the contraband." *Id.*

¶ 32　In *Wise*, the defendant was convicted of unlawful possession of a weapon by a felon after a gun was found near a passenger in the third row of the minivan that he was driving. 2021 IL 125392, ¶ 1. Our supreme court reversed his conviction, determining that the State failed to provide sufficient evidence that the defendant had the weapon "on or about" his person. *Id.* The defendant did not own the vehicle, the gun was found five to ten feet from the defendant, and the officer who recovered the gun testified that he did not see the defendant touch the gun nor did he believe that the defendant could reach the gun. *Id.* ¶ 34. Thus, the supreme court held that the State did not prove that the defendant constructively possessed the gun. *Id.*

¶ 33　Defendant's reliance on these cases is misplaced. *Wise* and *Day* involved constructive possession inside a vehicle and are thus unhelpful to the question of whether the State provided

- 11 -

sufficient evidence to prove that defendant habituated the residence in which the gun and ammunition was found or knew about the weapon inside the residence. *Fernandez* is also distinguishable because there was no evidence that the defendant in that case was ever in the residence, and the evidence established that the defendant received mail at a different address. *Sams* is likewise distinguishable because other than the defendant's presence inside the home when the police arrived, there was no evidence tying him to the gun or the home.

¶ 34 Rather, much of the missing evidence central to the reversals in *Fernandez* and *Sams* was presented at defendant's trial in this case. The testimony placed defendant inside the residence while police were there—he showed up at the residence while the deputies were waiting for the search warrant, tried to force his way back to the room where the drugs and gun were located, threatened to sue the deputies, and ultimately left the residence. In addition, defendant's jacket was found in the same closet where the gun was found. This evidence, along with the numerous traffic tickets, judgment order, box of drugs bearing his name, and his conduct while at the residence, is enough to support the inference that defendant knew about the gun in the closet and had control over the home and gun. Accordingly, we cannot say that "the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 542.

¶ 35 Next, defendant argues that the State failed to prove him guilty of child endangerment. He contends that the children were not identified by name in the indictment or at trial, and that the children were not in danger because the drugs were sealed and hidden.

¶ 36 While defendant argues that the evidence was insufficient in part due to the indictment not identifying the children, defendant did not argue in the trial court that the indictment was deficient,

nor does he advance that argument on appeal. He has therefore forfeited any argument that the indictment was deficient. *Hytel Group, Inc. v. Butler*, 405 Ill. App. 3d 113, 127 (2010).

¶ 37    We otherwise believe that the State presented sufficient evidence to prove defendant guilty beyond a reasonable doubt. As charged here, the State was required to prove that defendant knowingly "cause[d] or permit[ted] a child to be placed in circumstances that endanger the child's life or health." 720 ILCS 5/12C-5(a)(2) (West 2022). "A person is said to act knowingly when he is consciously aware that his conduct is practically certain to cause the offense defined in the statute." *People v. Melton*, 282 Ill. App. 3d 408, 417 (1996). Generally, the State proves knowledge through circumstantial evidence based on the surrounding circumstances. *People v. Monteleone*, 2018 IL App (2d) 170150, ¶ 26. Though "[t]he State must present sufficient evidence from which an inference of knowledge can be made." *People v. Penning*, 2021 IL App (3d) 190366, ¶ 19. Additionally, to prove "endangerment," the risk of injury is sufficient and evidence of an actual injury is not required. *People v. Jordan*, 218 Ill. 2d 255, 270 (2006); *People v. Collins*, 214 Ill. 2d 206, 215 (2005).

¶ 38    Here, the totality of circumstances support the conclusion that defendant knowingly placed the children in conditions that endangered their life and health. As previously discussed, there is ample evidence that defendant was living in the residence. There is also evidence that five children were inside the residence on the day of the search and two of the bedrooms contained children's belongings. Defendant does not cite any authority that requires the State to prove the children's identities at trial. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (arguments must be supported by citation to legal authority); *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises, Inc.*, 2013 IL 115106, ¶ 56.

¶ 39    Further, Crawford testified that he believed the lives of the children were in danger. The dangers of having drugs in a home with children are well established. As the Third District has recognized, " '[O]ne endangers a child's person or health by knowingly causing or permitting the child to be present with *** drugs.' " *Penning*, 2021 IL App (3d) 190366, ¶ 28 (quoting *Jones v. State*, 257 So.3d 285, 291 (Miss. 2018)). Children may accidentally ingest drugs and the children face an increased likelihood that the child will try the drugs, for example. *Id.* ¶ 25. Additionally, the quantity of drugs present in the house in this case puts the children in danger of violent behavior related to the sale or use of the drugs. See *id.* Accordingly, the State presented evidence sufficient for a trier of fact to conclude that defendant endangered the life or health of the children.

¶ 40    Defendant next argues that the armed habitual criminal and unlawful possession of a weapon by a felon statutes are facially unconstitutional under the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022). Though defendant did not raise this argument in the trial court, a facial constitutional challenge to a criminal statute may generally be raised at any time. *People v. Thompson*, 2015 IL 118151, ¶ 32. "A facial challenge to the constitutionality of a statute is the most difficult challenge to mount." *People v. Davis*, 2014 IL 115595, ¶ 25. "A statute is presumed constitutional, and the party challenging the statute bears the burden of demonstrating its invalidity." *People v. Graves*, 207 Ill. 2d 478, 504 (2003). A statute will be deemed facially unconstitutional "only if there are no circumstances in which the statute could be validly applied." *Davis*, 2014 IL 115595, ¶ 25. "We have a duty to construe the statute in a manner that upholds the statute's validity and constitutionality, if it can reasonably be done." *People v. Hollins*, 2012 IL 112754, ¶ 13. The constitutionality of a statute is a question of law, which we review *de novo*. *Id.*

¶ 41 The second amendment states: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II. Both challenged statutes prohibit the possession of a firearm by a person previously convicted of a felony. Specifically, the unlawful possession of a weapon by a felon statute states:

"It is unlawful for a person to knowingly possess on or about his person or on his land or in his own abode or fixed place of business any weapon prohibited under Section 24-1 of this Act or any firearm or any firearm ammunition if the person has been convicted of a felony under the laws of this State or any other jurisdiction. This Section shall not apply if the person has been granted relief by the Director of the Illinois State Police under Section 10 of the Firearm Owners Identification Card Act." 720 ILCS 5/24-1.1(a) (West 2022).

Similarly, the armed habitual criminal statute states:

"(a) A person commits the offense of being an armed habitual criminal if he or she receives, sells, possesses, or transfers any firearm after having been convicted a total of 2 or more times of any combination of the following offenses:

(1) a forcible felony as defined in Section 2-8 of this Code;

(2) unlawful use of a weapon by a felon; aggravated unlawful use of a weapon; aggravated discharge of a firearm; vehicular hijacking; aggravated vehicular hijacking; aggravated battery of a child as described in Section 12-4.3 or subdivision (b)(1) of Section 12-3.05; intimidation; aggravated intimidation; gunrunning; home invasion; or aggravated battery with a firearm as described in Section 12-4.2 or subdivision (e)(1), (e)(2), (e)(3), or (e)(4) of Section 12-3.05; or

- 15 -

(3) any violation of the Illinois Controlled Substances Act or the Cannabis Control Act that is punishable as a Class 3 felony or higher." *Id.* § 24-1.7.

¶ 42 In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court determined that laws banning the possession of handguns in the home and requiring other types of firearms to be kept unloaded and disassembled or bound by a trigger lock violated "the right of *law-abiding, responsible citizens* to use arms in defense of hearth and home." (Emphasis added.) The Court made clear that "the right secured by the Second Amendment is not unlimited" and that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill ***." *Id.* at 626.

¶ 43 In *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), the Supreme Court held that the second amendment applies to the individual states through the fourteenth amendment. In doing so, it again found laws similar to those at issue in *Heller* violated the second amendment's protection of the right to keep and bear arms. *Id.* at 750. The Court reiterated that it made "clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' ***. [Citation.] We repeat those assurances here." *Id.* at 786.

¶ 44 In *Bruen* the Supreme Court held that, consistent with *Heller* and *McDonald*, ordinary, law-abiding citizens have a right to carry a handgun for self-defense outside the home under the second and fourteenth amendments. 597 U.S. at 10. In so holding, the Court adopted the following test:

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical

- 16 -

tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24 (quoting *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n.10 (1961)).

Accordingly, under *Bruen* a court first asks whether the second amendment's plain text covers an individual's conduct. *Id.* If the conduct is protected, then the court asks whether the challenged statute is "consistent with this Nation's historical tradition of firearm regulation." *Id.*

¶ 45 Lastly, in *United States v. Rahimi*, 602 U.S. 680, 699 (2024), the Supreme Court reaffirmed the *Bruen* test and clarified that "*Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home." Indeed, the Court noted that "*Heller* stated that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.' " *Id.* (quoting *Heller*, 554 U.S. at 626, 627 n.26). The Court therefore rejected a challenge to a federal statute prohibiting firearm possession by a person subject to a domestic violence restraining order, determining that our nation's "tradition of firearm regulation allows the Government to disarm individuals who present a credible threat to the physical safety of others." *Id.* at 700.

¶ 46 "In the wake of Bruen, the Illinois Appellate Court has routinely rejected facial constitutional challenges to statutes prohibiting felons from possessing firearms on the ground that felons are not within the class of individuals protected by the second amendment." People v. Tapia, 2026 IL App (2d) 240721-U, ¶ 502. For example, this court has repeatedly held that the unlawful

---

[2]This court may rely on the reasoning in a nonprecedential decision under Illinois Supreme Court Rule 23 (eff. June 3, 2025). *Zhao v. State Farm Fire & Casualty Co.*, 2025 IL App (2d) 240713, ¶ 30; *People v. Ingram*, 2020 IL App (2d) 180353, ¶ 21 n.1.

possession of a weapon by a felon and armed habitual criminal statutes do not violate the second amendment under Bruen because felons are not protected by the plain text of the second amendment. See id.; People v. Martinez, 2024 IL App (2d) 230305-U, ¶¶ 30-34; People v. Gross, 2024 IL App (2d) 230017-U. ¶ 29; People v. Echols, 2024 IL App (2d) 220281-U, ¶ 153; People v. Smith, 2023 IL App (2d) 220340-U, ¶ 57. Those cases reasoned that the Supreme Court in Heller, McDonald, and Bruen made clear that "the people" referenced in the second amendment are "law-abiding citizens." See, e.g., Echols, 2024 IL App (2d) 220281-U, ¶ 153. Numerous other districts of the appellate court have similarly held that convicted felons are not protected by the second amendment. See, e.g., People v. Smith, 2025 IL App (5th) 230656, ¶ 25 ("we agree with the State and find better reasoned the federal and appellate court decisions holding or suggesting that felons are not protected under the plain text of the second amendment"); People v. Welch, 2025 IL App (1st) 231116, ¶ 57 (collecting cases and noting that the appellate court has "repeatedly held that statutes prohibiting a felon from possess[ing] firearms generally fall outside the scope of the second amendment"); People v. Burns, 2024 IL App (4th) 230428, ¶ 19 ("Bruen did nothing to contradict the Court's prior determinations [in Heller and McDonald] that the second amendment protects the rights only of law-abiding citizens to bear arms and that states may prohibit the possession of firearms by felons"); People v. Baker, 2023 IL App (1st) 230328, ¶ 37 ("The *Bruen* Court could not have been more clear that its newly announced test applied only to laws that attempted to regulate the gun possession of 'law-abiding citizens,' and not felons like defendant"); see also *Tapia*, 2026 IL App (2d) 240721-U, ¶¶ 50, 53 (collecting cases that rejected the argument that a felon's possession of a firearm is protected by the second amendment). We agree with the reasoning of these cases that "the people" referenced in the second amendment does not include convicted felons.

¶ 47    Nevertheless, even if we assume that a felon's possession of a firearm is protected by the second amendment, there are historical analogues supporting the disarming of felons under the second step of *Bruen*. The First District in *Brooks*, 2023 IL App (1st) 200435, held that the armed habitual criminal statute was constitutional under the second amendment and discussed the historical analogues supporting the disarming of felons at length:

"Restrictions on the possession of firearms date back to England in the 1600s when the government repeatedly disarmed individuals whose conduct reflected that they could not be trusted to abide by 'the sovereign and [his] dictates.' [Citation.] The English Bill of Rights established that Parliament had the authority to determine which citizens could 'have arms *** by Law.' [Citation.] The Parliament first disarmed non-Anglican Protestants who refused to participate in the Church of England and those who were 'dangerous to the Peace of the Kingdom.' [Citation.] It later forbade firearm ownership by Catholics who refused to renounce their faith. [Citation.]

In colonial America, legislatures continued to disarm individuals whose status indicated that they could not be trusted to obey the law. As such, Native Americans, and other minority groups, like Catholics in Maryland and Pennsylvania were banned from owning firearms. [Citation.] Similarly, during the Revolutionary War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to swear loyalty oaths. [Citation.]

Prior to the adoption of the Bill of Rights in 1791, during the ratification process, the 'highly influential minority proposal' [citation], published by the Anti-Federalist delegates in Pennsylvania, suggested that the people should have a right to bear arms

'unless for crimes committed, or real danger of public injury from individuals.' [citation]. While this amendment was not adopted, it is important because it reflects the understanding of the founders that 'crimes committed,' whether dangerous or not, justified disarmament.

Founding-era criminal punishments also demonstrate the widespread acceptance of the legislatures' authority to disarm felons. In the Colonial period, legislatures prescribed death or forfeiture of a person's entire estate (presumably including firearms) as punishment for numerous nonviolent crimes (including deceit, forgery, and wrongful taking of property). [Citation.] Even some non-capital offenses triggered the permanent loss of an offender's estate, including any firearms. For example, a 1786 New York statute punished those who counterfeited state bills of credit with life imprisonment and the forfeiture of their entire estate. [Citation.] Similarly, minor nonviolent infractions, such as hunting in prohibited areas, were punished with seizure of the firearms involved in the offenses. [Citation.]" *Id.* ¶¶ 93-96; see *Martinez*, 2024 IL App (2d) 230305-U, ¶¶ 38-41 (discussing *Brooks*' historical survey).

The court thus determined "there is a historical tradition of legislatures exercising their discretion to impose 'status-based restrictions' disarming entire 'categories of persons' who, based on their past conduct, were presumed unwilling to obey the law." *Id.* ¶ 97. Accordingly, the court concluded that "both the founding-era historical record and Supreme Court precedent support the ability of our legislature to prohibit firearm possession by people who have 'demonstrated disrespect for legal norms of society.' " *Id.* at ¶ 100.

¶ 48 The historical analogues discussed by *Brooks*—the same ones relied on by the State here— evidence a historical tradition of disarming individuals based on their demonstrated past conduct. By analogy (see *Bruen*, 597 U.S. at 30), the statutes at issue here are similarly disarming

individuals based on their past conduct—their felony convictions. We therefore conclude that the armed habitual criminal and unlawful possession of a weapon by a felon statutes are "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 24.

¶ 49 Defendant's arguments to the contrary are not persuasive. Defendant argues that there is no relevant analogue supporting flat bans on felons possessing guns. However, *Bruen* explained that an exact analogue or historical twin is not required. *Bruen*, 597 U.S. at 30. Rather, a "well-established and representative analogue" will suffice. *Id.* We believe that the historical laws discussed in *Brooks* support a historical tradition of disarming certain persons based on their past conduct. *See People v. Daniels*, 2025 IL App (1st) 230823, ¶ 44.

¶ 50 Defendant additionally argues that many of the historical analogues cited by the State and the *Brooks* court were "firmly rooted in racism, racial prejudice, bias, and discrimination and certainly would not pass constitutional muster today." *Id.* ¶ 45. However, as noted in *Daniels*, the historical laws discussed by *Brooks* that support current law disarming felons were focused on disarming persons " 'based on their past conduct' " rather than any improper animus. *Id.* ¶ 44 (quoting *Brooks*, 2023 IL App (1st) 200435, ¶ 97). The statutes here have the same focus, as they disarm certain individuals based on their past conduct—their felony convictions. Accordingly, we reject defendant's contention that the State has not shown that there is a historical analogue for the unlawful possession of a weapon by a felon and armed habitual criminal statutes.

¶ 51 In sum, we agree with the extensive case law in Illinois upholding the constitutional validity of the unlawful possession of a weapon by a felon and armed habitual criminal statutes. Defendant has not offered a persuasive reason to depart from this significant weight of authority, and we therefore reject his facial challenge to the statutes.

¶ 52    Defendant next argues that the statutes are unconstitutional as applied to him because his prior convictions were "nonviolent." "An as-applied [constitutional] challenge requires a showing that the statute violates the constitution as it applies to the facts and circumstances of the challenging party." *People v. Thompson*, 2015 IL 118151, ¶ 36. We review *de novo* whether the challenged statutes are unconstitutional as applied to defendant. *People v. Martin*, 2018 IL App (1st) 152249, ¶ 11.

¶ 53    Defendant again did not raise this argument in the trial court. A defendant may forfeit an as-applied constitutional challenge on appeal because the challenge "is dependent on the particular circumstances and facts of the individual defendant" and it is therefore "paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review." *Thompson*, 2015 IL 118151, ¶ 37. However, an as-applied challenge may be addressed on appeal where the evidentiary record developed in the trial court is sufficient. *Martin*, 2018 IL App (1st) 152249, ¶ 13.

¶ 54    Here, the predicate felonies for defendant's convictions were unlawful delivery of a controlled substance and unlawful possession with intent to deliver a controlled substance. Though the record is entirely devoid of the specific circumstances of these convictions, our review of defendant's argument is not hindered because those specific circumstances are immaterial to our constitutional analysis. *People v. Rich*, 2025 IL App (1st) 230818, ¶ 54.

¶ 55    This court determined in *Echols* that "whether defendant's qualifying convictions were 'nonviolent' is irrelevant, as the Supreme Court placed no qualifiers on the word 'felons' in either *Heller* or *McDonald*." *Echols*, 2024 IL App (2d) 220281-U, ¶ 156. In other words, defendant's possession of a weapon as a felon is not protected by the second amendment, whether the prior felony was violent or nonviolent, because he was not a "law abiding citizen." Moreover, under

the second step of *Bruen*, historical analogues support disarming previously convicted felons, even if the felony was nonviolent. See *Brooks*, 2023 IL App (1st) 200435, ¶ 100; *Echols*, 2024 IL App (2d) 220281-U, ¶ 156. This conclusion is in accord with the extensive weight of Illinois authority rejecting as-applied challenges based on the argument that a defendant's predicate felony was nonviolent. See, *e.g.*, *Tapia*, 2026 IL App (2d) 240721, ¶ 55; *Smith*, 2025 IL App (5th) 230656, ¶ 34; *Rich*, 2025 IL App (1st) 230818, ¶ 66; *People v. Lopez*, 2025 IL App (1st) 232120, ¶ 26; *People v. Travis*, 2024 IL App (3d) 230113, ¶¶ 36-37. Because defendant's claimed nonviolent prior offenses do not alter his status as a felon, his as-applied challenges to the statutes fail.

¶ 56 After briefing was completed, defendant filed a *pro se* motion for leave to file a supplemental brief, which we took with the case. In the motion, defendant argues that his appellate counsel was ineffective because appellate counsel did not file or "have the benefit of" a transcript from the trial court and for not raising the arguments in his proposed supplemental brief. In the supplemental brief, defendant argues that the entry into his home and subsequent search violated the fourth amendment. He also argues that his trial counsel was ineffective for failing to raise that argument in the trial court.

¶ 57 Ordinarily, a defendant represented by counsel may not file anything *pro se*. However, "represented defendants are allowed to raise *pro se* claims of ineffective assistance of counsel if they include supporting facts and specific claims." *People v. Serio*, 357 Ill. App. 3d 806, 815 (2005). Under the two-prong *Strickland* test, "a defendant must show that (1) his counsel's performance *** fell below an objective standard of reasonableness, and (2) *** but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 226 Ill. 2d 135, 143 (2007). Because a defendant must satisfy both prongs of the *Strickland* test, the failure to establish either is fatal to the claim.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, though defendant offers specific claims, defendant failed to supply supporting evidence.

¶ 58    First, the record shows that the claimed missing transcript was filed with the entirety of the trial court record on March 24, 2025. Defendant's opening brief was filed five months later in August 2025. Thus, the claim that appellate counsel did not file or "have the benefit of" the transcript is unsupported.

¶ 59    Second, the record does not reveal any fourth amendment violation. According to the trial testimony, the police initially entered the residence at around 6 p.m. because they observed children inside the residence without adult supervision. A warrantless entry of a residence to check on the welfare of a child is recognized as falling within the community caretaking exception to the warrant requirement. See *People v. Woods*, 2019 IL App (5th) 180336, ¶ 31. There is no evidence in the record that the deputies who entered the home conducted any search prior to receiving the warrant. See *id* ¶ 35 ("there is no evidence in this case that the community caretaking function was used as a subterfuge for a criminal investigation"). Rather, the record indicates that the deputies waited to receive a search warrant before conducting their search. Thus, defendant's fourth amendment claim is unsupported.

¶ 60    Finally, the record shows that defendant's trial counsel moved to suppress the evidence from the search of the residence on October 17, 2024, which was denied by the trial court after a hearing on November 19, 2024. That motion argued that the search warrant was not supported by probable cause. The trial court found that the affidavit submitted by Clesceri was sufficient, noting that "each different fact, taken in isolation, would cause one to question the search warrant. However, when taken as a totality, there is a substantial basis for a finding of probable cause." To the extent that defendant argues that his trial counsel was ineffective for seeking to suppress

evidence based on the initial warrantless entry, that initial entry fell within the community caretaking exception to the fourth amendment, as previously noted. See *id.* ¶ 31. There can be no ineffective assistance for failing to raise an unmeritorious issue. See *People v. Sims*, 2022 IL App (2d) 200391, ¶ 162. Thus, defendant's claim of ineffective assistance of trial counsel for failing to seek suppression of the evidence recovered in the residence is unsupported. Accordingly, we deny defendant's motion for leave to file a supplemental brief.

¶ 61                                    III. CONCLUSION

¶ 62     For the reasons stated, the judgment of the circuit court of McHenry County is affirmed.

¶ 63     Affirmed.